### In Re the Matter of: Walter

MARTIN *,

v.

Lisa MARTIN.

No. CS99–04675.

Family Court of Delaware,
Sussex County.

Submitted: May 14 & 16, 2002.
Decided: Aug. 19, 2002.

of its assumption of its jurisdiction if a proceeding were initiated there.

* Pseudonyms have been assigned to the parties to protect their identities.

Carol P. Braverman, Esquire, Law Office of Carol P. Braverman, Camden, DE, counsel for father.

Glynis A. MacAnanny, Esquire, MacAnanny & Gioia, LLP, Dover, DE, counsel for mother.

HENRIKSEN, J.

This is the Court's decision on cross petitions for custody filed by Walter B. Martin ("father") and Lisa M. Martin ("mother") in the interest of their two (2) children, Robert B. Martin, a six (6) year old male minor child born March 29, 1996, and Reese M. Martin, a nearly five (5) year old female minor child born May 23, 1997. In addition to hearing the testimony of the parties, the Court also heard testimony of Dr. Rosalind Kingsley, a psychologist presently licensed in the State of Vermont, and previously licensed in the State of Delaware, Dr. Theodore Wilson, a Delaware-licensed psychologist, Kelly Martin ("stepmother"), Martha Porter, maternal grandmother, Jake Bryant, mother's nineteen (19) year old son, and Jane Gilligan. The Court also conducted a private tape recorded interview of the two (2) children.

## BACKGROUND

Father and mother were married in the State of Virginia on April 24, 1994. They separated on or about July 1, 1999, although they lived under the same roof until October 15, 1999. They were eventually divorced by a decree of the State of Delaware on August 15, 2000. Two (2) children were born of the marriage, namely Robert and Reese.

This was the second (2nd) marriage for each of the parties. Father's first (1st) marriage, which lasted approximately three (3) years ended in divorce on February 1, 1994. No children were born of that marriage. Mother's first (1st) marriage, which lasted approximately seventeen (17) years ended in divorce in March of 1994. Mother separated in January of 1988 and remained married in order to remain on her first (1st) husband's military medical and commissary privileges. Mother had two (2) children by this prior marriage, Jake, now nineteen (19) years old, and Stephen, now seventeen (17) years old.

Father entered into his third (3rd) marriage on December 22, 2000, when he married his present wife, Kelly. Kelly already had two (2) children, ten (10) year old Scott, and eight (8) year old Cara.

Mother filed a PFA complaint against father on October 15, 1999. The parties entered into a Consent PFA Order on November 12, 1999. Among other things, the Order specified that the parties would share joint custody with mother having primary placement, noting, however, that father would have visitation for his four (4) days off each week. Pursuant to this PFA Consent Order, the parties agreed that mother could move to Virginia so long as

she accepted the jurisdiction of the State of Delaware to resolve the custody action. Furthermore, the parties shared the transportation responsibilities.

Following mother's filing of her PFA, but before the entry of the Consent Order, father filed on October 29, 1999, his petition seeking custody which is before the Court today (99–35721). Mother subsequently filed a petition for custody on December 1, 1999, also before the Court today (99–38650).

After a full hearing on the merits, this Court entered an Order on April 4, 2001 awarding joint custody to the parties, primary placement to father, and visitation to mother of one (1) weekend per month, a sharing of holidays and school breaks, six (6) weeks summer vacation, and providing that all exchanges of the children would occur at the Pocomoke, Maryland police station.

Mother filed an appeal of the Court's April 4, 2001 decision. By Order dated February 11, 2002, the Delaware Supreme Court reversed the April 4, 2001 decision of this Court and remanded this case for a new custody hearing.[1] The Supreme Court noted the following particular concerns:

1. If father was involved in an openly adulterous relationship to which his children were exposed, the Court should consider such conduct, as it affects the moral character development of children, as a relevant consideration in determining the best interests of the children, notwithstanding father's subsequent marriage to the woman with whom it was alleged he was having the affair.

2. At the prior hearing Dr. Edward Wilson gave testimony that eighty percent (80%) of third (3rd) mar-

riages result in a divorce. The Family Court should have acknowledged or attempted to reconcile this statistic with the Family Court's overall findings on the comparable stability of the environments offered by the respective parents.

3. The Supreme Court found that there was little, if any, testimony about the quality and nature of the relationships the children have with their half-brothers and mother's extended family, or about the childrens' adjustment to mother's home in Virginia.

4. The Supreme Court did not believe that this Court had given sufficient consideration to the Consent PFA Order entered into between the parties.

On December 7, 2001, mother filed a Petition for Visitation Modification (01–39658). On this same date, mother also filed a Rule To Show Cause Petition against father (01–39660). On January 7, 2002, father answered mother's Motion for Visitation Modification, and also filed a counter-claim. By Order of this Court dated January 30, 2002, these matters were consolidated to be heard together. Furthermore, at the outset of the hearing on May 14, 2002, the parties all agreed that these prior Petitions for Visitation Modification and Rule To Show Cause and counter-claim should also be consolidated with the present hearing on the cross petitions for custody. The Court agreed.

On February 26, 2002, this Court held a telephone conference involving father's counsel and mother, who was then acting *pro se*, the purpose of which was to select a neutral psychologist as required by the Delaware Supreme Court, to establish the terms of payment for that psychologist,

---

1. *Martin v. Martin,* 797 A.2d 678 (Table), 2002 WL 229502 (Del.Supr.2002).

and also to set a trial date. The parties agreed upon utilizing the services of Dr. Rosalind Kingsley. It was the understanding of the Court, the parties, and Dr. Kingsley that Dr. Kingsley would be involved in making two (2) trips to Delaware. One (1) trip would be in early April to conduct evaluations, and the next trip would be to give testimony on the day of trial. Also included would be the time spent in performing her evaluations and writing her report in preparation for trial. The parties and Dr. Kingsley all agreed upon a fee of $2,750. Subsequently, however, the Court noted, and the parties agreed, that Dr. Kingsley had been required to spend additional time in the court room on the May 14, 2002 trial date beyond the original description of her services to be provided. This was necessary because of the direction of the Court that Dr. Kingsley and Dr. Ted Wilson, another psychologist, would both be in the court room at the same time, and be able to comment on the testimony of the other. As such, Dr. Kingsley incurred an additional $250 in billing time. At the conclusion of the testimony given on May 14, 2002, the Court verbally ordered Ms. Braverman to turn over to Dr. Kingsley the $2,750 escrow fund. In addition, the parties agreed to deposit within thirty (30) days with Ms. Braverman an additional $250 for Dr. Kingsley's additional fees, sixty-eight percent (68%) of this amount being contributed by father and thirty-two percent (32%) being contributed by mother. Upon receipt of these funds, Ms. Braverman was then directed to forward the $250 to Dr. Kingsley. It should be noted that the Court's original direction to the parties whereby father would contribute sixty-eight percent (68%) of Dr. Kingsley's fees, and mother would contribute thirty-two percent (32%) of the fees, was based upon knowledge the Court had of the parties' respective incomes prior to the hearing. The Court noted that the parties were still free to make arguments at the conclusion of trial as to why these percentage figure payments of Dr. Kingsley's fees should be different.

On April 29, 2002, the Court held a subsequent pre-trial telephone conference involving Ms. Braverman on behalf of father, and Glynis A. MacAnanny, Esquire, who now represented mother. In that conference, the Court determined that Dr. Kingsley would be the first (1st) witness to testify, followed by Dr. Theodore Wilson. On behalf of mother, Ms. MacAnanny objected to Dr. Wilson's testimony, noting that his examination of the parties in this action occurred nearly fifteen (15) months ago. The Court denied Ms. MacAnanny's objection noting that the Court found Dr. Wilson's testimony to be relevant, and that the timing of his examinations would go to the weight given to his testimony.

At the outset of the hearing, the parties informed the Court that they agreed that they should share joint custody. The parties also agreed that the non-primary placement parent should receive visitation along the standard guidelines of the Court, except that Wednesday mid-week visitation should be eliminated because of the distance between the parties. They also agreed that additional visitation to the visiting parent should be allowed freely when the visiting parent is in the vicinity of the children and gives two (2) days advance notice to the primary placement parent. Thus, the primary issue to be resolved is with which parent these children should primarily reside.

The Court entered an Interim Visitation Order on May 24, 2002 which gave mother time with the children over the Memorial Day weekend, and also awarded mother visitation with the children every other weekend from Friday at 6:00 p.m. until Sunday at 6:00 p.m. beginning Friday,

June 7, 2002. Pursuant to the Interim Order, all exchanges of the children were to occur at the police barracks in Pocomoke, Maryland.

## FACTS

The Court first heard the testimony of Dr. Rosalind Kingsley. Dr. Kingsley received her Bachelor's Degree from Michigan State in 1952. Thereafter, she was a teacher for several years, certified in music. Because of concerns with the development of one of her own children, she eventually went into the field of psychology and graduated with a Master's and Doctorate in 1978 from Hoefstra University. She followed this as school psychologist in Milford, Delaware for three (3) years. She then went into private practice in the Milford/Milton, Delaware areas. She served as psychologist for the Delaware State Police for over fifteen (15) years, and also was involved in evaluating paramedics in the State of Delaware. Dr. Kingsley noted that she never evaluated Mr. Martin, as her services with the Delaware paramedics ceased before he came to work for them.

Presently, Dr. Kingsley is not licensed in the State of Delaware. That license expired approximately five (5) months ago. However, Dr. Kingsley is licensed as a psychologist in the State of Vermont, and is considering reinstating her Delaware license. She last testified in a Court of law in Windham County, Vermont approximately two (2) months prior to this trial. Over the years, she has testified numerous times in the State of Delaware in several courts in all three (3) counties.

Dr. Kingsley evaluated both parents and the two (2) children on April 9, 2002. Although Dr. Kingsley testified that she would have found it helpful to interview other significant individuals, especially father's present wife, Kelly, the Court specifically restricted Dr. Kingsley's interviews to mother, father and the children because of the Supreme Court's directive in their Order dated February 11, 2002.

Dr. Kingsley first interviewed Lisa Martin ("mother") for approximately two-and-three-quarters (2–3/4) to three (3) hours. Dr. Kingsley first asked questions about mother's background. Dr. Kingsley learned that mother was born in Norfolk, Virginia, and has two (2) sisters and two (2) brothers. Mother is a high school graduate, attended Tidewater Community College in Virginia Beach, and also earned a certificate as a paramedic. Mother presently works as a paramedic in the emergency room at Childrens' Hospital of the King's Daughters in Norfolk, Virginia.

Dr. Kingsley reported that mother was married on two (2) occasions. By mother's first marriage, she had two (2) children, Jake, who is now nineteen (19), and Stephen, who is now seventeen (17). According to mother, the boys chose to remain with their father in Virginia when mother moved to Delaware in December of 1996. Actually, however, the Court later learned that Jake remained in Norfolk, Virginia with his father when mother and Walter Martin moved to Delaware, but Stephen moved to Delaware with mother and Walter Martin for approximately three (3) months. Stephen eventually returned to his own father in Virginia.

According to Dr. Kingsley, mother stated that the boys still live with their father in Norfolk. Furthermore, mother told Dr. Kingsley that she saw Jake and Stephen *"all of the time"*. Since the Court also had the opportunity to hear the testimony of now nineteen (19) year old Jake Bryant, the Court finds mother's statement to be somewhat an exaggeration. In one (1) statement, Jake said that he saw his mother two (2) or three (3) times a week. However, Jake also said that he only had

dinner with his mother when his half brother and sister, Robert and Reese, were visiting, which presently occurs once a month. Jake also indicated that he was not able to comment on the interaction between Robert and Reese and their half-cousins who presently live across the street from his mother. Jake said this was because he was not there too much of the time. Furthermore, Jake was not clear on his mother's present work schedule. Jake's responses led the Court to believe that Jake did not actually see his mother as often as both she and Jake at first suggested.

Mother also told Dr. Kingsley that mother's sixty-eight (68) year old father, John, is retired, and mother's sixty-six (66) year old mother, Martha, works occasionally, but is typically a homemaker. They live in Norfolk, Virginia. Mother's one (1) brother, John Porter, III, is forty-two (42) years of age and is a laborer who lives in Norfolk. He is married with two (2) biological daughters and one (1) stepdaughter. Mother's sister, Nina Maier, has been divorced for several years, is forty (40) years of age, and the mother of two (2) daughters. She lives and works in Florida. Mother's last sibling, Daniel Porter, is thirty-seven (37) and divorced. He has one (1) child who does not live with him. He is a laborer and works in Chesapeake, Virginia.

In her report to Dr. Kingsley, mother noted that she married Walter Martin ("father") in 1994. At that time, father was in the Navy and stationed in Norfolk. She pointed out to Dr. Kingsley that father was married when she met him. Quite ironically, however, the Court learned that mother was also married when she and Walter Martin met, as mother's marriage ended in March of 1994. Mother's statement to Dr. Kingsley was that she and father had lived together for three (3) years prior to their marriage on April 25, 1994. At any rate, according to mother's statement to Dr. Kingsley, father came to her house and asked if he could move in, and she agreed. Mother then stated that father, *"gets along well with Jake and Stephen."* The Court must note that this seemed quite contrary to Jake's testimony wherein Jake, both by his own admission, and as also testified to by Jane Gilligan, stated that he hated Walter Martin and also stated that he would like to kill Walter Martin.

In the reports of both mother and father, Dr. Kingsley described how the couple had a child named Christine, who was born in January of 1995. Christine lived approximately nine (9) days and then died. The couple never found out the reasons for Christine's death. Both of the parties had told Dr. Kingsley that this was the turning point in their marriage. Mother told Dr. Kingsley that she was *"still feeling very guilty about the baby's death."* This death was then followed by father leaving the Navy. Although mother told Dr. Kingsley that father had been unemployed for about three (3) months, father testified that the time period of unemployment was quite a bit shorter. Both parties agreed, however, that they went badly into debt and eventually filed bankruptcy. Father eventually found employment in Delaware as a paramedic, and commuted from the family's home in Virginia to Delaware for a year. Robert was born in late March of 1996 and Reese's birth followed fourteen (14) months later in May of 1997. When the family moved to Delaware, as noted previously, Jake remained with his father. Stephen moved to Delaware with the family for about three (3) months and then returned to his father. Mother told Dr. Kingsley that she had interviewed with the Sussex County paramedics, but did not get hired because they found out she was pregnant. She eventually was hired, and

filed a grievance, which was eventually settled out of court. Dr. Kingsley said that mother described this time period as *"There were so many up and down emotions then."* All of the information testified to by Dr. Kingsley has led this Court to conclude that the parents in this action experienced more than their share of stress, beginning with the death of their baby Christine, going through debt and bankruptcy, extended time apart from each other for a year while father commuted to Delaware to work, a move where one (1) of mother's older children, and eventually both children, remained in Virginia with their father, the birth of two (2) children, and involvement in a legal grievance procedure with their mutual employer.

Mother told Dr. Kingsley that father had told her in August of 1999 that he was not happy. Mother then returned to Virginia with the children, and the parties were divorced in August of 2000.

Dr. Kingsley reported that mother described Dr. Wilson, the psychologist who testified in the prior trial in this matter, as a man, who *"bludgeoned me on paper. He [Dr. Wilson] only touched on the fact that Bill was an adulterer."* She further told Dr. Kingsley that Dr. Wilson only saw her for thirty (30) minutes before she was given the MMPI (Minnesota Multi–Phasic Personality Inventory.) It should be noted at this point that Dr. Wilson testified in rebuttal that he met with mother first on October 18, 2000 when she took the MMPI which lasted approximately one-and-a-half (1–½) hours, and then he took a history lasting approximately one (1) hour. Dr. Wilson further testified that on November 21, 2000, he saw mother for two (2) hours by herself and asked questions of her, and then saw her interact with her two (2) children. Dr. Wilson further stated that he again met with mother on October 31, 2001 and administered the MMPI test for

a second (2nd) time and again talked with mother. The reason mother retook the MMPI, according to Dr. Wilson, was because the results on the first occasion indicated that she was very defensive, overcautious, and evasive to discuss problems of her own. In sum, Dr. Wilson estimated that, in addition to the MMPI testing time, he spoke to mother over three (3) hours during the several interviews.

Dr. Kingsley noted that mother stated that she was presently taking Zoloft, prescribed by her family physician.

Mother then went on to tell Dr. Kingsley that *"both children have become encopredic."* Encopresis is a condition where a person soils their underwear. Frankly, based upon Dr. Kingsley's testimony, the Court was initially of the impression that this condition had only started as of approximately one (1) year ago when Robert was ordered by this Court to live primarily with his father. Most startling to the Court, however, was Dr. Wilson's subsequent testimony that mother had told him during an interview on November 21, 2000 that Robert had been encopredic. According to mother's prior statements to Dr. Wilson, Robert had been encopredic approximately three (3) times a month. Thus, the encopresis did not begin when primary placement was awarded to father. Instead, it had begun well before that time. When asked by Dr. Wilson in November of 2000 if mother saw the encopresis as a problem, mother responded to Dr. Wilson that it did not seem to be a problem. Obviously, this was contrary to Dr. Kingsley's reporting which was based upon the information provided to Dr. Kingsley by mother, that Robert's problems with encopresis began when Robert first went to father.

Dr. Kingsley administered a series of tests including human figure drawing, family drawing, Bender Visual/Motor Gestalt

test, Rotter Incomplete Sentences–Adult Form, and the Rorschach. In both parents, Dr. Kingsley found them to have an excellent self-image and good interpersonal skills.[2] If anything was to be gleaned from the picture drawing, it was that mother drew the eyes vacant, which Dr. Kingsley stated suggests an attempt to remove herself emotionally. Father's drawing almost filled the page, which Dr. Kingsley stated suggested a very good self-image without feelings of insecurity.

As the Court reviewed the sentence completions for each of the parties, the Court found most significant of those responses to mother's statements that *"men are irresponsible"*, my mind *"needs to feel more at peace"*, and sometimes *"I think I need to change my occupation* [because] *the emotional things take their toll"*. Father's sentence completions indicated a seeming respect for both men and women.

Dr. Kingsley also testified that she believed mother had difficulty trusting.

Regarding the Rorschach testing[3], Dr. Kingsley testified that she uses the Exner system, which in her opinion based upon the large base of results, is now considered objective. Dr. Kingsley found that mother distances herself because she is unable to trust. According to Dr. Kingsley's results, mother also does a lot of self-examination. Dr. Kingsley found mother to be emotional, but internalizing a lot of her emotion. Dr. Kingsley also felt that mother suffered from chronic stress because she had not resolved the issues of Christine's death, misses her two (2) children and also has

not resolved the loss of her marriage to father.

As to mother, Dr. Kingsley concluded that mother was well-adjusted, suffered from some depression, but that it was not suicidal or debilitating, that mother had stable employment, and that mother also had a stable family in that her parents were close by and were relatively healthy.

As to Robert, Dr. Kingsley had considerable concern about Robert's encopresis. She testified that this was a sign of anxiety and regression. Dr. Kingsley believed that Robert wants to go back to an earlier behavior when he felt more comfortable. Dr. Kingsley testified that Robert needs play therapy, that he should not be required to wash his pants out[4], and he needs considerable love and understanding.

Dr. Kingsley then testified about her examination of father. According to father's statements to Dr. Kingsley, he attended high school, served in the United States Navy for ten (10) years, earned a paramedic certificate in Virginia Beach, Virginia, took some college courses in Engineering while in the service, became nationally registered as a paramedic, and has been serving as a Sussex County, Delaware paramedic since December of 1995.

Father told Dr. Kingsley that his first (1st) marriage ended in divorce in February of 1992, with no children being born of the marriage. Although he was married for three (3) years, father told Dr. Kings-

---

2. It is interesting to note, however, that Dr. Kingsley's report on Page Three (3) found father to be a man with an excellent self-image and good interpersonal skills. Whereas, on Page Four (4) of her report, she stated father had an impaired self-image and was very concerned about what others thought of him.

3. This is a test that involves people's statements of reactions when looking at various ink blots. The responses are then compared to a large data base of the responses of others with various known characteristics.

4. Stepmother acknowledged that she had required Robert to wash out his pants when he had soiled them.

ley that he was separated a good deal of the time because of his military commitments. Father agreed with mother's statement that their marriage started to go bad after Christine's death. Father described how he commuted between Virginia and Delaware during the first year of his employment as a paramedic. Father also told Dr. Kingsley about mother's oldest children not wanting to move. According to father, he was under a lot of stress, and he and mother *"fought every day for about four years."*

Father told Dr. Kingsley that his father died in March of 1997 at age fifty-three (53) from coronary heart disease. His mother, Sally, is fifty-five (55) and disabled. She lives in Ohio. Father also has a sister, Laura, who is thirty-two (32), married, and the mother of one (1) child and lives in Wisconsin.

Father told Dr. Kingsley that his own mother may be an alcoholic, and that his parents were hippie-types. Father on the other hand, is very structured. According to Dr. Kingsley, as confirmed by others' testimony, father does the cooking in his present household, and Robert enjoys cooking with his father.

Father uses sports as an outlet for his frustration. Father has stress, which is apparently a result of his important job involved in saving lives as a paramedic, but he gets out to relieve that stress. According to Dr. Kingsley, father sees his present marriage as ideal, although it took some time getting there. Father wishes he had more money and worries about losing the children. According to Dr. Kingsley, father copes well with stress.

Dr. Kingsley believed that both parents were capable of raising these children. She also believed that father was in a good marriage, and that father's stress involved money and having four (4) children in the household.

Dr. Kingsley also described Robert, age six (6), as attending afternoon kindergarten at the Evelyn Morris School. Dr. Kingsley had particular knowledge of this school, and believes it is a good situation for Robert. She noted that Robert is very structured. She also noted that he brought talking books to his appointment with Dr. Kingsley. Dr. Kingsley noted that Robert would not be willing to do anything else until he organized the task he had just completed. Neatness was very important to Robert.

Dr. Kingsley was also concerned with Robert's spontaneous statements that Robert's younger sister dirties her pants. Robert denied to Dr. Kingsley that he dirtied his pants. Dr. Kingsley also noted that father did not mention the encopresis problem. Dr. Kingsley purposely did not bring this subject up to see whether father would bring it up.

During Robert's sentence completion, Dr. Kingsley noted that Robert stood extremely close to her, always touching her, as though he wanted to be hugged. Dr. Kingsley sees Robert as a child with needs who is somewhat insecure.

Although Robert did not hold a pencil correctly, he was able to print his name and Dr. Kingsley found him to be very bright.

Robert told Dr. Kingsley that he likes to do things with Kelly. He also likes to cook with his father. Robert told Dr. Kingsley that when he was a baby, *"sister and I played together—pooped and peed together."*

Robert sometimes also cooks with Kelly. It was clear from Dr. Kingsley and Robert's responses that he goes to the doctor when he needs to go. Robert also thinks well of himself.

Robert seemed to indicate his wishes in this case to Dr. Kingsley when he stated he misses his mother when he gets worried. Robert also told Dr. Kingsley that he cries about his mother in bed, and that he wishes he could spend more time with his mother. In one spontaneous moment, Robert told Dr. Kingsley that *"I could stay with Daddy and Kelly for four days—couldn't I?"* It was very clear to Dr. Kingsley that Robert wanted to spend more time with his mother.

As to Reese, Dr. Kingsley noted that she was very attached to her father. In fact, as we sometimes use the Oedipus complex to describe a boy's connection to his mother, Dr. Kingsley used the term "Electra" phase to describe Reese's need to be with her father. Indeed, when father brought Reese to the interview with Dr. Kingsley, Reese would not speak and would not leave her father's lap. However, when Reese left the interview with her father, Dr. Kingsley observed that Reese was speaking normally. Dr. Kingsley noted that Reese is going through a developmental stage which is often seen in four (4) year old girls. According to Dr. Kingsley, *"From the age of about two until six, little girls are very strongly attached to their fathers. They don't want to share Daddy with Mommy at all. This phase is usually gone by age six."*

Dr. Kingsley concluded that Reese was a normal child with adequate self image and no developmental problems.

On cross examination, Dr. Kingsley agreed that mother did not discuss with Dr. Kingsley any concerns mother might have about the effect of the children living with father and his girlfriend. Concerning sleeping arrangements, Dr. Kingsley believed that a child should have their own bed from day one (1). She also agreed that it was important to encourage children to be independent, such as wiping

themselves. Dr. Kingsley also stated that by age five (5), a parent should reward the positive in a child, by giving hugs for being good. According to Dr. Kingsley, a child at this age should be sleeping alone, eating with their own utensils and wiping themselves.

Although very speculative, Dr. Kingsley noted that Robert's Oedipal complex may have been disrupted at the time the marriage broke up. This might lead to various problems. Similarly, Dr. Kingsley noted that a female being separated from her father at a time when she is building trust in her father, might later affect her ability to go to her father so that he could reassure her that her budding sexuality is appropriate. Without this reassurance, according to Dr. Kingsley, the child might become promiscuous.

Dr. Kingsley noted that the father described that Reese and Robert get along very well with Kelly's two (2) children, Scott and Cara. Dr. Kingsley stated that she suspected this was true.

Dr. Kingsley noted that she did not like boys and girls sleeping in the same room with their parents.

Dr. Kingsley suspected that father and stepmother have little time to communicate, mainly because they were two (2) working parents with four (4) children. Incidentally, both father and stepmother subsequently testified that they believed they communicated often and well.

On the sleeping arrangements of a child sharing a room with another child, or perhaps sleeping in a room with their parents, Dr. Kingsley indicated that this was not the best situation, but probably was not harmful when children are young.

Dr. Kingsley also addressed the issue of father's possible adultery, if, indeed, it ever occurred, and what effect it might have had on Robert and Reese. First, Dr.

Kingsley noted that, if indeed there was an adulterous situation, society does not make it out to be such a big deal as it was thought of in the early 1980s. Dr. Kingsley went on to state that it is never a good situation for a child to know a parent is having sex with another. And despite the change in morals over the years, Dr. Kingsley noted that the standard is still to be faithful to your spouse. Thus, as Dr. Kingsley noted, society is faced with situations versus society's ideals. Certainly, father is a major role model in his childrens' lives. Dr. Kingsley acknowledged that Robert's knowledge of father's adultery, if it occurred later, may impact on Robert's perception of honesty, keeping a promise, and morals.

The Court next heard the testimony of Dr. Theodore Wilson. Dr. Wilson received his Bachelor's Degree from the University of Delaware in 1972, followed by his Master's and Doctorate from Duke University in 1975 and 1979, respectively. He taught for five (5) years in the State of Alabama. He came to the State of Delaware in 1984, where he became the Clinical Director at People's Place until 1987. Dr. Wilson became licensed in Delaware as a psychologist in 1987. He has been involved with Kent General Hospital, is on the Delaware Board of Examiners for Psychologists, and has testified in Family Court in all three (3) Delaware counties. Dr. Wilson has done some work for the Department of Corrections.

It should be noted that Dr. Wilson was the psychologist who gave testimony in the previous trial in this case. Since the present trial is a completely new trial, only the statements made by Dr. Wilson in the present trial will be considered. His information, however, is based upon the same interviews he conducted for the trial of almost a year ago.

Both Dr. Kingsley and Dr. Wilson were present in the Court room and able to hear the other's testimony. As such, Dr. Wilson heard Dr. Kingsley testify about the statements mother made about Dr. Wilson in which mother indicated her perception that Dr. Wilson had *"bludgeoned"* mother on paper. Thus, the first thing testified to by Dr. Wilson was that he does not take cases where he feels he is a psychologist for one (1) of the parties. Instead, according to Dr. Wilson, if he takes a case for a custody evaluation, it is for the best interests of the child.

Dr. Wilson performed evaluations on father, mother, stepmother and the two (2) children over the time period from August 30, 2000, when he first saw father, to January 31, 2001, when he administered the second (2nd) MMPI test to mother. Dr. Wilson testified that he had no bias against mother either before or presently.

Dr. Wilson testified that his general procedure has been to perform what he considers a standard custody evaluation, which involves a gathering of historical information, observation of the parents with the children, and administration of the MMPI. Dr. Wilson acknowledged that he does not do as much assessment as some of his other colleagues in northern Delaware, and that to do so, may raise costs. However, Dr. Wilson also noted, in part due to the Court's earlier decision in this particular case, he may change his style in the future to include some additional types of tests.

Dr. Wilson also noted that his protocol follows the American Psychological Association recommendations. That protocol includes evaluating all significant individuals, which in this case, would have included the step parent. Dr. Kingsley also testified that she would have liked to have interviewed the step parent; however, this Court limited Dr. Kingsley's evaluations to

the two (2) parents and the children because of the Supreme Court's mandate.

Continuing on with the protocol used by Dr. Wilson in this particular case, as well as in other cases, he noted that he uses the MMPI to rule out psychopathology. He also noted that Dr. Kingsley, instead of using the MMPI, uses the Rorschach test.

Dr. Wilson's protocol also includes seeing each parental figure with the children in a sterile environment. In this way, he gets to observe the dynamics within the family and gains a sense of the parenting style. Dr. Wilson acknowledged that this observation is subjective on the surface, but, in his opinion, objective as it looks to certain aspects. Dr. Wilson also determines the history of the parties, particularly the developmental history of the children from each parent, and how each parent has been involved. He also rules in or out drug and alcohol abuse. Finally, Dr. Wilson ascertains whether certain legal issues have been appropriately addressed, such as adherence to Support Orders and other Orders of the Court.

Dr. Wilson then went on to state that the two (2) most written about mental status examinations in history are the MMPI and the Rorschach. He distinguished the two (2) tests by noting that the MMPI is an objective test consisting of five hundred and sixty-seven (567) true or false questions, whereas the Rorschach test is a subjective assessment. Dr. Wilson also stated that Dr. Kingsley would say that the Rorschach test, administered under the Exner system, is objective. Dr. Wilson also acknowledged that he is not as competent as Dr. Kingsley in administering the Rorschach.

Under the MMPI test, the answers a person gives to the five hundred sixty-seven (567) questions are compared to answers of a huge sample of persons. The answer to one (1) question may be relative to more than one (1) of several profiles within the system. Dr. Wilson administers the test by placing the patient in front of a computer.

The MMPI has eight (8) validity scales, which test for such things as fatigue, deceitfulness and projecting one's self better than one is. The test also checks for depression, psychiatric problems, anxiety, and other factors. Dr. Wilson stated that both the MMPI and the Rorschach examines a person and draws conclusions of that person's personality on that particular day. Dr. Wilson also noted that several psychologists, especially upstate Delaware psychologists, do not like to use the MMPI because the validity scales on the test itself tell that they often receive invalid results on the balance of the test.

In Dr. Wilson's testimony, there were two (2) points that were most notable. First, he specifically contradicted the information that Dr. Kingsley had understood from mother that mother had only spoken to Dr. Wilson for a total of thirty (30) minutes other than the administration of the tests. Indeed, Dr. Wilson's estimate was that he spoke to mother on several occasions, for a total of three (3) hours over and above the testing. Secondly, it was Dr. Kingsley's impression from speaking with mother that Robert had been experiencing encopresis only for the last year, which would have coincided with the approximate time when the Court ordered primary placement of Robert with father. However, Dr. Wilson's notes taken on November 21, 2000, clearly indicated mother's statement to Dr. Wilson that Robert was encopredic, experiencing episodes up to three (3) times a month, much earlier than the date Robert came primarily under father's care. Since mother informed Dr. Wilson that Robert's encopresis did not appear to be a problem, Dr. Wilson did not explore it further. Dr. Wilson further

commented that Robert's developmental history has been delayed. According to information given by mother to Dr. Wilson, Robert walked at eighteen (18) months and talked at two (2) years, when the average time for both of these events would have been one (1) year. Thirty (30) months would be the average for toilet training, and Robert apparently went thirty-six (36) months.

Dr. Wilson testified that he first met mother on October 18, 2000. At that time, he administered the MMPI which took about one-and-a-half (1–1/2) hours, and then he took a history of mother's relationship with her first (1st) and second (2nd) husbands, as well as her psychiatric history. The history took approximately one (1) hour. Dr. Wilson again saw mother on November 21, 2000, at which time he saw her for approximately two (2) hours by herself and asked questions and then observed her with her two (2) children.

Dr. Wilson finally saw mother on January 31, 2001, when he administered the MMPI test to mother for a second (2nd) time. He also spoke with mother on that occasion. Mother retook the MMPI since the validity scales in her first MMPI indicated that she was very defensive, over-cautious and evasive about discussing problems of her own.

On the second (2nd) administration of the MMPI, which occurred on January 31, 2001, mother's "L" scale, or "lie" scale was eighty-six (86). According to Dr. Wilson, this represented an extreme attempt by mother to look like she was free of problems, and that she was extremely moral. In Dr. Wilson's experience, one (1) who takes a second (2nd) test would normally have a lower "L" scale. This was not the case with mother, who on her original test, had an "L" scale of fifty-two (52).

Dr. Wilson also noted that mother's depression scale on the MMPI was very low for someone who was undergoing depression.

Dr. Wilson noted that mother was extremely hesitant and evasive on responding to questions on almost all occasions. For example, when Dr. Wilson asked mother if she had taken Robert to preschool, mother gave a very long answer to explain why she had not, rather than simply saying "no".

In taking the history from mother, Dr. Wilson was informed that mother viewed the reason the marriage dissolved was because father had deserted the family for his girlfriend. Mother noted that she had two (2) children by a prior marriage, the oldest of which, Jake, in 1996 attempted to overdose on Tylenol, and was seen in follow-up care for anger management. Also in 1996, both of her older children went to live with their father when mother moved to Delaware. In 1995, mother sought psychological treatment when Christine died, and she again sought treatment in 1999 when her husband left.

Dr. Wilson then testified to one (1) interesting point that he heard from Dr. Kingsley. Dr. Kingsley had said that mother was still grieving Christine's death. According to Dr. Wilson, it was now seven (7) years since Christine's death in 1995, and that seven (7) years was outside the normal time for bereavement. According to Dr. Wilson, if mother is still taking Zoloft for depression over the loss of her daughter, she also should be having therapy.

Dr. Wilson noted that his observations when talking to mother in his various interviews was that of a depressed effect and subdued mood.

Dr. Wilson also had the opportunity to observe the children with each set of parents. He observed different styles. As to mother, at a time when Robert was four

(4) and Reese was three (3), Dr. Wilson noted that Robert put the cap back on color markers when he was done, but Reese simply colored what she wanted. Dr. Wilson noted that mother was either fatigued or stressed, but she did not guide the children and intervene with them. In short, mother failed to display control over the children. In what seemed to be an inconsistency to Dr. Wilson, mother had told him that she did not give the children naps; however, when the childrens' behavior escalated during the interviews, she threatened to give the children naps.

In Dr. Kingsley's testimony, she had noted how close Robert stood to her when doing the sentence completions. This led Dr. Kingsley to conclude that Robert was a needy child. Dr. Wilson agreed with Dr. Kingsley's analysis that Robert was a very needy child. According to Dr. Wilson, he believed that Robert had not successfully completed his separation from his mother, and his individuation. According to Dr. Wilson, he saw two (2) sides to this problem. On one (1) side, mother and child needed to separate somewhat from each other because the Court Order required it. On the other side, however, when mother and child were together, mother would not allow the separation to occur. On this theme, Dr. Wilson further commented that mother may not be allowing the children to separate from her because she does not want to separate from them. There were suggestions that mother was allowing the children to both sleep in bed with her when they came to visit. In fact, Robert told the Court that he and his sister would sleep with their mother when they visited because his sister became afraid of the dark. According to Dr. Wilson, it is not a good idea to have children in bed with you after they are two (2) years of age, unless there is some special reason such as sickness or a thunderstorm. Dr. Wilson heard Dr. Kingsley testify about Robert's sentence completions wherein he indicated he dreams about his mother, and he cries about his mother in bed. Dr. Wilson expressed concerns about this conduct, and noted the need for the children to go to professionals, who would also work with both parents and the children.

As to the reasons for Robert's encopresis, Dr. Wilson noted that this often occurs where a child is lazy, angry or suffering from anxiety. Whatever the reasons for this encopresis, Dr. Wilson agreed with Dr. Kingsley that the parties need to have the child seen by a professional to determine those reasons.

Dr. Wilson went on to state that if a parent does not allow a child to separate from them, the child will continue to view himself through the eyes of its parents, instead of seeing themselves through peer groups as should be done when the child is in school. Additionally, the child is not allowed to develop into an autonomous child.

According to Dr. Wilson, he found it in the best interests of these children that father, stepmother and mother meet with the counselor to get on a common ground for the good of the children, so that the children are not spinning like tops. In Dr. Wilson's eyes, changing placement from father to mother at this time in the hopes that this will fix the problems, is not the answer.

Dr. Wilson went on to discuss his testing and interviews with father and stepmother. The MMPI also showed that father and stepmother were trying to make themselves look good, but not to the conscious distortion level as attempted by mother. He found father to have good ego strength, and to be a person who sets goals, is persistent and makes it happen. He found no mental health concerns with stepmother, although she does suffer from

multiple fears, including spiders, snakes and high places. There were no concerns for alcohol, abuse, or legal issues, nor psychiatric problems in either father or stepmother. Although father was raised a Catholic, he is not big on church. However, father is big on education.

Dr. Wilson had an opportunity to observe father and stepmother with the children. Dr. Wilson noted that these children, then four (4) and three (3), were a handful. However, father was able to get them to sit quietly and controlled them when they got out of line. Father had control of the children, but not out of fear. Of the three (3) adults, Dr. Wilson felt that the stepmother was the parent who showed the most appropriate parenting skills. In fact, Dr. Wilson, who had an opportunity to see not only stepmother and father with Robert and Reese, but also with stepmother's children, Scott and Cara, found that the stepmother was clearly in charge and she was able to re-direct their behavior in most cases, and in a friendly manner. Dr. Wilson described stepmother's ability to control the children as "impressive". Dr. Wilson also had observed that the children climbed all over father, which caused Dr. Wilson to conclude that father was a nurturer. Dr. Wilson also observed that all four (4) children in father's home intermingle easily.

The main concern that Dr. Wilson expressed about father was father's response to what father believed to be in the best interests of the children. Rather than father saying what he could offer the children, father discussed the bad things that mother would do. Dr. Wilson indicated that a better response would have been for father to indicate the good things he could offer.

Dr. Wilson also discussed the sleeping arrangements that he heard described by Dr. Kingsley, as related by mother. It had been suggested, and indeed later testimony bore out, that for quite some time, Robert and Reese slept on a mattress together on the floor in the same bedroom as occupied by father and stepmother. Testimony also bore out, especially Robert's interview with the Court, that Robert and Reese sleep in the same bed with their mother when they visit mother. Most recently, Robert and Reese now have their own bedroom that they share, and are in separate beds. Dr. Wilson explained that there are various reasons why parents have to have different sleeping arrangements for children. However, he noted that if he had to choose, it would be preferable for each child to have their own space on a mattress on the floor, rather than be sleeping in the same bed with a parent.

Dr. Wilson testified that at the conclusion of his testing of all the parties, which ended in December of 2001, he had concluded that the split or shared custody of four (4) days with mother and four (4) days with father was not good for the children. As such, the children needed to be at one (1) home or the other. Dr. Wilson believed that the children needed a stable and consistent environment. Dr. Wilson therefore favored father who, in Dr. Wilson's opinion, offered a more stable environment. Dr. Wilson went on to say that Dr. Kingsley's evaluation was more of a psychological evaluation of the parties, than a custody evaluation. He testified that nothing in Dr. Kingsley's psychological evaluation would cause him to change his prior opinion.

Dr. Wilson also indicated that he could not believe he had testified in the prior trial that eighty percent (80%) of third (3rd) marriages result in divorce. Obviously, the transcript of the earlier trial confirmed that he had made such a statement. Dr. Wilson recanted that statement. According to Dr. Wilson, fifty per-

cent (50%) of first (1st) marriages end in divorce. A greater percentage of second (2nd) marriages end in divorce, and a greater percentage in third (3rd) marriages end in divorce than second (2nd) marriages.

Dr. Wilson next addressed the moral effect that, assuming father had committed adultery, would have on the children. In Dr. Wilson's opinion, these young children would not be affected. If, however, these children observed a consistent pattern over time, such as father again leaving for another woman, it may affect the children's sense of security. Dr. Wilson went on to say that, assuming father had committed adultery, it would not affect the children at this young age unless the children were told that this was the reason why the parties split. Although Dr. Wilson indicated the children should not be lied to if they ever asked, at the same time, Dr. Wilson believed it could be extremely harmful to the children if the other parent, in this case the mother, were to use the story of father's alleged adultery as a frequent rallying call, and thereby allowing mother to "execute [her own] pathos to keep the children in the loop". Dr. Wilson clearly stated that if mother were to state that stepmother was a husband-stealer, this could be harmful to the children, and that mother should not make such statements. Thus, in sum, Dr. Wilson stated that if the children don't ask, don't tell them. If they ask, tell them and move on. However, in no way, should the story become a constant rallying call. If one parent were to place this concept in the mind of the children as a regular rallying call, Dr. Wilson opined that it could impact on the child's ability to form relationships in the future.

Dr. Wilson went on to note that he did not believe it was in the childrens' best interests for them to sleep on a mattress together in the same bedroom with the parents for three (3) years.

It was also suggested by mother to Dr. Wilson that it would have been preferable for the two (2) stepbrothers to be placed in a bedroom together, and for the two (2) stepsisters to be placed in a bedroom together. Dr. Wilson did not agree to this general statement, because there could be a security factor by keeping the little ones together. Although culturally the appropriate answer might be to put the same sexes in the same bedroom, Dr. Wilson indicated that the answer to that question is much more complex.

Dr. Wilson was also concerned that if Robert continued to sleep in the same bed with his mother, if that was true, it could adversely affect Robert's abilities of separation and individuation.

After Dr. Wilson completed his testimony, the Court entertained discussion by both Dr. Wilson and Dr. Kingsley. Dr. Kingsley first emphasized that the Rorschach test had a large normative base drawing from populations of normal people, abnormal people, and suicidal people. In Dr. Kingsley's opinion, the Rorschach test under the Exner system is now considered objective and not subjective.

Both psychologists agreed on several areas. First, they agreed that there needed to be better communication and interaction between the two (2) biological parents for the sake of the children, and that interaction should also include the stepmother. Using a therapist would be highly recommended. Second, both psychologists agreed that the children need as much contact with mother as logistically can be allowed. Dr. Wilson still believed that it was in the best interests of the children to remain with father, but there should be more visitation with mother. Dr. Kingsley did not make a recommendation as to which parent should have primary place-

ment. There also seemed to be agreement that, if the school systems could allow, that mother have some extended weekends which would allow mother greater time with the children, assuming primary placement remained with father. Although an eight (8) hour drive every other weekend for the children to be exchanged between parents could be somewhat difficult on the children, it was preferable to the present one (1) weekend visitation per month. The psychologists both agreed that visitations for mother could be extended in the summer.

The counselors also discussed that mother could be overreacting to the loss of Christine through death, and may be carrying it over to the loss of primary placement of Robert and Reese. Dr. Kingsley also added that mother should not be frowned upon for her negative feelings she feels about her marriage dissolving. Dr. Kingsley also emphasized that you never lie to a child, and you tell the truth to them if asked. However, a parent must not continue to go over and stress a negative story about the other parent.

At the conclusion of the first day of trial, the Court then interviewed six (6) year old Robert, followed by almost five (5) year old Reese. Robert told the Court that he liked school, likes school trips, playing outside, and also likes cooking with Daddy. He also liked playing with his stepsister and stepbrother, Cara and Scott.

Robert also commented that he and his sister now sleep in their own room at father's home and have separate beds. He recalled a time when he and his sister slept on a mattress in the same room as his father and stepmother, but he could not remember how far back that occurred. Robert also stated that at Easter, when he was visiting his mother, he and his sister Reese slept in the same bed with their mother because Reese was afraid of the dark. According to Robert, both children had started out in their own beds.

When the Court asked Robert whether anyone had discussed what to say to the Judge, he offered that his stepmother thought he should spend more time with his mother. In fact, Robert was quite clear that he wanted to spend more time with his mother. He indicated he wanted to be with his mother on Friday, Saturday, Sunday, Monday and Tuesday and then with his father for two (2) days.

At his home with father, Robert also has two (2) dogs, two (2) cats and some fish. When asked if any of the adults ever talked about each other, the only thing he could say was that his father had told him that his father and mother were not friends anymore. When Robert visited with his mother, he said he liked to go fishing with her and practice fishing with her. Robert also noted that he has a grandmother he visits when he is with mother. Robert was somewhat confused when he indicated that the grandmother had two (2) husbands. The parties, however, noted that one (1) of the individuals was actually the grandfather and the other was an uncle. At any rate, these people also like to catch fish.

When asked how he felt about his half brothers Jake and Stephen, he said he liked Jake. Stephen, however, had been mean to him on several occasions. According to Robert, he was not going to see Stephen for a while because Stephen was going to be taking a long nap for "a hundred and eighty hundred years". Robert also knew that he had two (2) Karens in his life. One (1) is his stepsister, Cara. The other is an Aunt Karen, who the Court later learned is mother's sister who resides in Florida.

The Court then briefly interviewed Reese. Although Robert squirmed in his

chair considerably, almost arriving at a horizontal position at one point, Reese sat much straighter in her chair. It was clear to the Court, however, that Reese had not yet reached a maturity level where the Court would be able to obtain any serious communication of wishes from her. It should be noted, however, that although Reese did not communicate with Dr. Kingsley, Reese did speak to this Judge.

The Court began the second (2nd) day of trial on May 16, 2002, with the testimony of thirty-five (35) year old Walter B. Martin, the father. Father described his health as "outstanding". He then offered a history of events.

In approximately 1991 or 1992, father married his first (1st) wife. He was employed by the United States Navy at the time. As father stated, during his three (3) year marriage to his first (1st) wife, they were together about six (6) to eight (8) months. The marriage suffered from poor sexual relations and lack of communication. He first met Lisa Martin in August of 1992, and the two of them commenced living together in mother's home in Virginia Beach, Virginia, approximately two (2) weeks after their meeting. At the time father moved in with mother, mother was aware that father was married. Although father was aware that mother had two (2) children, he did not know that mother was still married until they started living together. According to father, when he moved in, mother's children, Jake and Stephen, instantly liked him. Jake and Stephen were approximately nine (9) or ten (10) and six (6) or seven (7), respectively, at that time. The parties had no discussion at the time concerning the morality of father moving in while he was still married. In fact, at that time, mother was also married. Mother married in 1977, separated in January of 1988, and eventually obtained a divorce in March of 1994.

Father actually obtained his divorce from his first (1st) wife prior to mother obtaining her divorce, with father being divorced in February of 1994. The parties were then married in Virginia Beach on April 25, 1994.

Father was discharged from the Navy on July 7, 1995. According to father, he was out of work for approximately two (2) weeks, and then took a job with the Portsmouth Ambulance Company. Father eventually was able to obtain employment in the State of Delaware. Unfortunately, this employment required father to commute from Virginia Beach and remain in southern Delaware four (4) days a week.

The parties had their first (1st) child, Christine, in 1995. Father was still in the service at this time. Christine was born with a shoulder distortion, although the parties thought she would be okay. Christine died after nine (9) days. According to father, this was the turning point in their marriage. Both went through counseling, although mother went through more counseling. Father indicated that he felt he was better able to work through his grief through his work and studies, while mother was unable to work through her grief. Christine's death created a strain on their relationship. Father indicated they could not get close together after Christine's death.

In 1996, mother's oldest son, Jake, then fifteen (15), attempted suicide through a Tylenol overdose. Jake received psychiatric therapy.

At some time while the parties were still residing in Virginia Beach, they were having severe difficulties with debt and they declared bankruptcy. According to father, both of them were equally guilty in compiling the debts. Mother had a somewhat compulsive buying behavior and father, who is non-confrontational, did not have

the ability to tell mother that they could not afford the item.

According to father, all of these foregoing events created considerable stress in their marriage. The couple then moved to Delaware, where life became even more stressful. The parties moved to Delaware in January of 1997. Mother's oldest son, Jake, refused to move to Delaware. Instead, Jake remained with his own father in Virginia. Mother's younger son, Stephen, moved with the couple to Delaware for approximately three (3) months. However, during that three (3) month period, Stephen tried to run away, skipped school and stole items. Stephen eventually returned to Virginia to live with his father. The fact that both of these boys went to live with their father was upsetting to mother. It should be noted that when the family was all living together, father testified that he generally took mother's lead in dealing with Jake and Stephen, because they were her children. He described mother's style of discipline at the time as aggressive, which seemed to emulate mother's own mother, which was a physical type discipline, which included spanking, grabbing a child, and pulling their hair.

The parties second (2nd) child, Robert, noting that Christine, the first child had died, was born while the parties were still in Virginia on March 29, 1996. After the parties moved to Delaware, and fourteen (14) months after Robert's birth, the parties third (3rd) child, Reese, was born on May 23, 1997.

Thus, as of this point, the parties had gone through the death of a child, a bankruptcy, an overdose by one of mother's children, both of mother's children deciding that they wanted to live with father, a period of time of being apart when father commuted from Virginia to Delaware to work, a move to Delaware, and the birth of two (2) young children. Unfortunately, the stress grew even more when mother, who had been promised a job by the Sussex County, Delaware paramedics, was denied her employment because she was pregnant. The parties then became involved in a grievance procedure based upon the illegality of mother's denial of employment because she was pregnant. This procedure finally culminated after about a year in August of 1998, when the Sussex County paramedics and mother reached a mutual termination agreement, concluding the on-going law suit, and concluding mother's part-time employment which had been offered to her as a paramedic in the interim period. In addition to issues regarding the lack of hiring because of mother's pregnancy, there also arose issues from mother's superiors about her standard of care as a paramedic. Some of the supervisors would then discuss these problems with father, who then attempted to discuss them with mother. Unfortunately, according to father, mother saw father's advice as being offensive, rather than helpful. During all of the time when mother and father were both employed, they worked out taking care of the kids by staggering shifts, so that they were pretty much involved in a drive-by and hand off the children situation. Thus, each of them would be independently responsible for taking care of the children while the other one was working.

Mother then took a job in September of 1998 as a dispatcher at Childrens' Hospital in Philadelphia, Pennsylvania. She was gone a lot because she worked four (4) ten (10) hour shifts. In order to help out with taking care of the children, the parties also employed a day care center run by Teresa Dressler. One of those employees, Carolyn Black, came to work with Teresa Dressler in March of 1999. Carolyn Black continues to be the day care provider for the children to this day. While at day

care, Robert also met his life-long friend, Bianca, who is the same age and who rides the bus with Robert. It should be noted in Dr. Kingsley's evaluation, that Robert identified as his best friends his stepmother's children, Scott and Cara, as well as Bianca.

Approximately one-half (½) year before Carolyn Black became the day care provider, father met his present wife, Kelly. Kelly worked at registration at Milford Hospital, where father's duties as a paramedic would often take him. They would often have conversations together. In February of 1999, there was a problem with mother getting off work. Although father attempted to adjust his schedule, he was unable to do so. Apparently, all of father's telephone calls occurred at the Milford Hospital in Kelly's presence, and she could see that he was in a dilemma. At this point in time, father had known Kelly for approximately six (6) months casually, felt Kelly was a trust worthy person, and therefore accepted Kelly's offer to step in and assist by picking up the children and watching them until the parents could retrieve them. For the next many months, Kelly then became the stand-by babysitter when neither parent nor the day care provider could watch the children. Kelly was paid for her babysitting services. Furthermore, both parents knew Kelly and both interacted with her. However, father's interaction was most likely on a greater frequency because father would see Kelly during his paramedic duties at Milford Hospital where Kelly was employed. Eventually, as described by both father and Kelly, the two (2) would often take walks together in the park, along with their respective children. This often occurred when father would pick the children up from Kelly's house, and Kelly and her two (2) children would go to the park along with father and his two (2) children. The parents would talk while the children would play.

According to father, the parties separated in July of 1999. Father believed that mother blamed him for her paramedic failures. Father stated that mother was always confrontational. As of July 1999, father slept on the couch, although the parties still resided under the same roof. Father said he remained in the house for the children. There were also times that father would go out and tell mother that he was taking the children and going for a walk in the park with Kelly and her children. According to father, he and Kelly had no romantic attachment at this time, and the children were always present during these walks.

On October 15, 1999, mother filed a Protection From Abuse complaint against father. Mother alleged that father took the children to see his girlfriend, Kelly. Although father admits that he did go see Kelly, he denies that Kelly was his girlfriend at that time. Father also denied that he did not get back in time to place the children in bed for their bedtime. Father denied that the only time he ever saw his children was when he was with Kelly. Father was quick to note that mother also used Kelly as a sitter up until this date. Father absolutely denied that Kelly was his mistress. Although he recalled he and mother having a heated argument just prior to mother's filing of the PFA, he denied ever grabbing and twisting mother's wrist.

Around this time, and mentioned in mother's PFA petition, father had ordered a Day Planner refill for both himself and Kelly. According to father, he was placing his order when Kelly observed what he was doing, and she asked him to place an order for her as well. Kelly also wanted a name plate. Although father indicated he put down Kelly's initials, the last one being a "B", the plate apparently arrived with

Kelly's initials, but with the last initial being the same as father's initial, "M". Father was confronted about this by mother. Father never saw the plate. However, if the plate actually did have Kelly's initials ending with an "M", father stated it was an error.

Around the time the PFA was filed, Kelly was still living with her ex-husband. Although Kelly and her ex-husband had agreed not to be married any longer, they were very cordial towards each other.

According to father, he and mother discussed the PFA complaint after she filed it. Father stated that mother agreed that the filing was done in a fit of anger, and she wanted to rescind the filing. However, in the interim, father had also filed a custody petition. Mother was served with his Petition for Custody. They eventually attended the PFA hearing on November 12, 1999. Father stated that it was explained to him that it was her word versus his, so he decided to mediate. Father also stated that the mediator explained to him that the Consent Order would be inadmissible in a custody case. Father was not represented by counsel at the time. Pursuant to the Consent Order rendered on that date, mother was awarded the use of the residence as well as the use of the 1994 van. Although the Order states that mother was awarded primary placement of the children, in reality, the Order was more of a shared placement Order. Specifically, the Order stated that father would get the children on his four (4) days off per week. Father also consented to mother moving back to the State of Virginia so long as she agreed to return to Delaware to litigate the action. The parties also agreed to share travel time, in order to transport the children.

On October 5, 2000, both parties agreed to vacate the PFA Order.

There was also testimony by father countering mother's statements made to Dr. Kingsley that mother had been evicted. In fact, the testimony revealed that the parties were behind on their rent and there were also problems with a chest freezer. The rental matter was eventually resolved in a Consent Order with the landlord in the Magistrate's Court where mother was allowed to remain in the home until the end of December of 1999.

The last time father was actually in the marital home was shortly after mother's filing of the PFA on October 15, 1999. For awhile, father stayed at the paramedic station to take showers and sleep on the couch. He even lived out of his car. Father eventually stayed in a hotel with the children for two (2) weeks when he had some vacation time. Eventually, father moved into a home he rented from Kelly's mother, located on New Street in Dover, Delaware. He lived there by himself along with the two (2) children when they were visiting with him.

After the time father moved out of the marital home, Kelly began to have problems with her husband just prior to Thanksgiving of 1999. A few days before Thanksgiving, Kelly came to stay with father, along with her children, in the home the father rented from Kelly's mother. At this point in time, the relationship moved immediately into a romantic one, with father and Kelly sharing the same bed. Both Kelly and father noted, however, that they did not have sex in the presence of the children. Kelly and father, along with Kelly's two (2) children and father's children four (4) days each week, subsequently moved into a home Kelly had just had built which was ready in January of 2000. Kelly had signed a contract and purchased the land for this property in April of 1999. This home, where the parties continue to reside, was too small for all of them. In

Kelly's testimony, she noted that she only bought a home large enough for herself and her two (2) children, since she had no plans between April of 1999 and January of 2000 of living with father and his children.

According to father, life with Kelly and the four (4) children, is happy, healthy and with all of the children having various routines. The children attend YMCA swimming and the parties are now looking at summer camps for the children. Getting the children into sports has been difficult because of the uncertainty of the present status of this case. Kelly and father have also been involved with the Parent–Teachers Organization, school fairs and continue to take walks in the park together with the children. The children also attend music classes and phonics classes.

At home with father and Kelly and the four (4) children, are also two (2) dogs, two (2) cats and two (2) fish. The present home has three (3) bedrooms. One (1) bedroom, the master bedroom, is presently used by mother's daughter, Cara, and is shared with the parents who sleep on a mattress on the floor. Robert and Reese have their own beds, sharing a second bedroom, and Scott has a third bedroom of his own. Prior to January of 2002, Cara had her own bedroom, which is now used by· Robert and Reese, and Robert and Reese slept on a mattress in the same bedroom with the parents. According to father, he and Kelly were concerned about separating Robert and Reese from each other because they were young at the time that separation from mother occurred, approximately four (4) years and two-and-a-half (2–½) years of age, and they had also heard mother state to the children that Kelly had stolen their father away from her. Thus, it was the thought of father and Kelly that the children wanted to stay close to them. Father assured the Court

that he and Kelly did not have sexual relations while the children were in the same room. Kelly also confirmed this information. When mother's attorney cross examined Kelly, suggesting how unbelievable it would be that the parents did not have sex in the same room as the children, Kelly noted that there were other places in the house where that could be done.

Kelly and father have made attempts at moving to a different residence which would be larger, and also located in Sussex County. Father's employment as a Sussex County paramedic requires him to reside within the county. In one (1) case, they placed a $1,000 deposit on a property, but the parties then provided them with a final price which was too high. In another house, they had a contract to move in after preliminary approval was given on their loan. However, when the credit search came back on the bank's mortgage, it was discovered that the debt still existed on the van which mother was in possession of pursuant to the PFA Order. It should be noted that this debt was never resolved in a property division between the parties, nor was the responsibility for the payment of that debt ever resolved between the parties as part of an Interim Order or as part of the PFA Order which gave mother the use of the van. At any rate, Kelly and father's ability to buy the second (2nd) home fell through for lack of financing. Kelly and father are still looking for suitable housing.

Father testified that the children have regular doctors in the area. They use Dr. Scott as a pediatrician and Dr. Stewart as a dentist. Both doctors are located in Milford, Delaware.

Father went on to testify that Robert is doing very well in school. Robert's kindergarten report card was placed into evidence. Father has attended field trips and is in contact with the school.

Father next noted, contrary to findings by Dr. Kingsley, that he and Kelly have excellent intercommunication. They spend a lot of time together with the children. If father is cooking, Kelly assists with the other dinner preparations. Father noted that the entire family eats dinner together.

Father testified that he has difficulty communicating with mother. In father's opinion, he believes that mother is bitter and hostile, based upon her perspective of the divorce. Although mother blames the end of the marriage upon father's relationship with Kelly, it appears to this Court that there was a series of numerous stressful situations beginning with Christine's death which led to the end of the parties' marriage when their separation occurred in July of 1999. Although Kelly had certainly become a friend and a person in whom father could confide concerning his problems, the romantic relationship with Kelly did not begin until after mother and father had separated, and the marriage had been destroyed. Father is concerned that mother fails to see what really occurred in their marriage. He further is fearful that mother may be putting ideas into the childrens' heads that they should not like Kelly, and that Kelly stole him from mother. Father is fearful that if the children were to live primarily with mother, mother would teach the children to hate Kelly.

During the marriage, father often saw depression exhibited in mother's conduct, such as lack of good housekeeping and motivation to improve herself. Even in the visitation exchanges, mother is generally late. Furthermore, father indicated that mother will often try to provoke a hostile situation during these exchanges. Father's recitation of exchange problems since the Court's prior decision of April of 2001 went something like this:

1. Upon receipt of the April 2001 decision, father sent mother an e-mail letting her know the date and time he would pick the children up in Pocomoke, and even described to mother how she could reach the exchange point. Mother's response was that she had no knowledge of the Order or the pick up point. Thus, father had to drive all the way to Virginia Beach to obtain the children on April 15, 2001.

2. On Memorial Day in May of 2001, mother failed to show, although father was waiting in Pocomoke for her with the children.

3. On June 17, 2001, mother was to begin her two (2) week summer visitation with the children. Father was at Pocomoke with the children, and mother failed to show. Mother then stated that she showed up in Pocomoke later, and had read the Order incorrectly. Mother then drove to Milford, Delaware on Monday, June 18, 2001, to obtain the children, which father allowed. At that time, however, mother had failed to bring car seats. Father provided car seats to mother and never received them back from mother.

4. On July 1, 2001, mother requested a later time to make the exchange and father agreed. Upon returning the children to father, mother did not bring back father's car seats. Instead, mother gave father her old soiled car seats. Also at that time, Robert's hair had been buzzed off.

5. On July 8, 2001, father was in the car preparing to go to Pocomoke for the exchange at 10:00 a.m., when mother called to say she could not be there until 2:00 p.m.

6. On August 5, 2001, mother had called to say she hurt her knee at work and could not drive. She eventually picked the children up on the following Wednesday, to which father had agreed.

7. On August 19, 2001, mother called and asked to have extra time, but father objected because he had plans. However, instead of mother returning the children at 10:00 a.m., as required, the exchange occurred at 11:30 a.m.

8. On September 3, 2001, Labor Day, the scheduled time of exchange was 9:00 a.m. Father waited until 9:30 a.m. and mother failed to show.

9. On November 22, 2001, Thanksgiving, mother had called the day before to indicate that she would be unable to get the children. Mother later testified that the visitation was too short on time to be meaningful, so she chose not to exercise the visitation.

10. On December 24, 2001, the parties were to exchange the children at 6:00 p.m. Father had made arrangements to work that night, and planned to have Christmas at his home on December 26th. Father drove to Pocomoke and waited until 6:30 p.m. without mother appearing. He then contacted his wife, Kelly, who called Linda's mother in Virginia. Linda's mother informed Kelly that Lisa was not coming because she was working. According to father, Robert was "crushed". Robert had things to show mother, including his school project. Robert then proceeded to soil his pants.

Out of all of this, father continues to believe that Pocomoke is an appropriate place. However, father expressed a desire to have some plan in effect so that he would know when mother is leaving, or even if she is coming to Pocomoke, so that he could then plan his departure time.

Father also testified that mother wanted telephone contact with the children. Since the family is often busy with events, father set up certain windows of time during which mother could call. Unfortunately, according to father, mother was inconsistent in making telephone calls during those "windows of times". As a result, mother did not have as much telephone contact with the children as she might have desired.

Father testified that Robert's encopresis had subsided for approximately one (1) year prior to starting up again after mother's failure to show up for the Christmas Eve visitation on December 24, 2001.

Father then expressed his wishes in this case. First, father would like to have the children live primarily with him. He would also like mother to have ample visitation with the children, including every other weekend, extended summertime and a sharing of holidays. Father would also like to get Robert, and perhaps Reese, involved in therapy. Since the hearing two (2) days prior, when father heard the psychologists speak, father or Kelly contacted Dr. Kennard, a psychiatrist in Seaford, Delaware who was recommended by Dr. Wilson. They learned that mother could participate in these counseling sessions by telephone. It appears that they have arranged an appointment for May 29th or May 30th of 2002.

Father described mother's good points as being a caring and loving individual, and able to care for the children. However, he was concerned that mother's lifestyle provides a free-for-all for the children, and there is sometimes too much hugging and kissing. According to father, herein lies the difference between he and mother.

Father believes that he offers much more structure and offers an environment where the children would follow the rules, act calm and quiet, as well as show affection, but not excessive affection.

Father then commented on his prior experience concerning mother's relatives living in Virginia. The maternal grandmother, Mrs. Porter, was used occasionally for baby sitting. She is affectionately known by the children as "Meema". Father indicated that she provided adequate care, but has present concerns about Meema's health. Father was able to observe Meema in the Court, and, in father's opinion as a paramedic, she looked poor. She had just lost a toe, her color was not good, and she moved poorly. Also living in Virginia with Meema is her husband, the paternal grandfather. Mother's brothers, Daniel and Joe, also live in the area. According to father, they rarely saw Daniel, and they saw Joe sporadically. Mother also has a sister who lives in Florida. Mother also has another sister who father did not recall mother being close to.

When asked why Robert and Reese were sharing a mattress for a time period of over two (2) years from January 4, 2000 when they moved into Kelly's home, until January of 2002 when Robert and Reese were given a separate room, father responded that Scott, who is now ten (10) years old, always had his own room. Also, Cara always had her own space. Robert and Reese, on the other hand, were used to their space together. The parties had intended to wait until they moved. Unfortunately, their various settlements fell through, as previously discussed, so they did not make the move until January of 2002. Apparently the last contract on a house fell through in December of 2001.

Father also testified that he and Kelly had contacted Robert's pediatrician, Dr. Scott, concerning Robert's encopresis.

The last time they recalled Robert being encopredic was April 15, 2002. It was Dr. Scott's suggestions that Robert be encouraged to go to the toilet more often, be given more time in the bathroom and also ask his teachers to be sure that Robert goes before he gets on the bus.

The Court next heard the testimony of Martha Porter, the childrens' maternal grandmother. Ms. Porter's testimony was taken out of turn over the telephone. Although Ms. Porter had been at the Court on the previous day of the hearing, she was required to be in Virginia on this date for a doctor's appointment to follow up on recent surgery for the removal of her toe. The Court wanted to receive her testimony before she had to attend her doctor appointment.

Ms. Porter resides in Norfolk, Virginia, just a few miles from mother's residence. Ms. Porter noted that she has kept the children when mother has had to work, and she has stayed with the children overnight. She also observed that the children "cling to" their mother, and she can tell by this that they miss her and love their mother. Ms. Porter reported that her daughter takes the children fishing, to the park and the museum.

On the subject of discipline, Ms. Porter reported that her form of discipline was usually to give time outs. If the children did not listen, she would then swat them on the leg, being sort of a tap using the palm of her hand.

Ms. Porter reported that in the past she had the opportunity to observe the children with their father. According to Ms. Porter, father did not pay the children any attention. He would usually watch television on the couch, while he allowed Ms. Porter to care for the children for a two (2) week period when she was visiting the couple in Delaware.

Ms. Porter reported that her daughter now works weekends, but that her daughter does not work on the weekends when the children are visiting her. Ms. Porter also understood, that if mother received more weekends, she could work days and have her weekends free.

Ms. Porter reported that mother has other relatives in the area. Living across the street from mother is mother's cousin, Dana Barnes, along with her husband and four (4) children ages seven (7) through thirteen (13). Ms. Porter reported that these people are close to Robert and Reese. Ms. Porter also noted that nineteen (19) year old Jake and soon to be eighteen (18) year old Stephen have regular contact with Robert and Reese. According to Ms. Porter, she observed that all of the children love each other and that Robert wanted to have his hair cut like Jake. Ms. Porter believes that her daughter could care for the children on a full time basis.

Ms. Porter also indicated that she was still able to baby sit the children in the event her daughter needed assistance. Ms. Porter is sixty-nine (69) years of age and reports that her health is fine. It should be noted, however, that Ms. Porter suffers from Type II diabetes, for which she takes insulin. She was also in the hospital two (2) months ago for circulation problems. She recently had poor circulation in her broken toe, and therefore had to have the toe removed. Ms. Porter also indicated that her seventy-one (71) year old husband John was in good health. However, she also acknowledged that he had a stroke and walks with a walker.

The Court next heard the testimony of Kelly Martin, the stepmother of the children. Mrs. Martin ("stepmother") is forty-two (42) years of age and in good health. She is presently employed at the Bay Health Medical Center in Milford, Delaware in the office of registration and admissions. She was previously married to Roger Regan. Her marriage to Roger Regan resulted in two (2) children being born during the marriage, ten (10) year old Scott[5], and eight (8) year old Cara. Stepmother reported that she has a good relationship with her ex-husband and that he visits with the children three (3) weekends per month. She further noted that Robert and Reese also like her ex-husband.

Much of stepmother's testimony recited the same concept of facts earlier recited by father. Thus, stepmother reviewed the scenario where she first was a baby sitter for both of the parties. Because mother worked in Philadelphia, she saw father more than mother in the exchanges of the children. She also confirmed that there was no romantic or sexual relationship between she and father until some time after father had moved out of the marital home with mother. Thus, as also stated by father, stepmother and her two (2) children moved in with father in a home rented by father from stepmother's mother sometime before Thanksgiving of 1999. In early January 2000, stepmother and father and the children then moved into a home which stepmother had purchased the land for in April of 1999, and on which the home was eventually completed in January 2000.

Prior to the commencement of their romantic relationship in mid November 1999, stepmother reported that she considered herself a friend to both father and mother. During the summer of 1999, she was aware that things were not good between the couple, and stepmother stated that she encouraged both of them to talk to each other. Stepmother also reported that she did not know when father initially moved

---

**5.** The Court learned that Roger Regan is not Scott's father.

out of the home after the PFA, nor did she know that he was living at the station. Stepmother learned that father was eventually out of the home near the end of his two (2) week hotel stay. Father then moved into the home rented from stepmother's mother, and stepmother eventually joined him. Stepmother also confirmed that even after living with father, she and father did not have sex in the same room as the children, noting that there were other places in the house where they could engage in that activity without the children knowing.

Stepmother then discussed her relationship with the childrens' mother. According to stepmother, the mother's dislike of stepmother was obvious. In front of stepmother, mother would make statements to the children apologizing to them for their father's failure to meet for a visitation transition. According to stepmother, however, mother had showed up at the residence of father and stepmother an hour-and-a-half (1–½) earlier than the appointed time, and also not at the place intended for the exchange. As a result, father was not available to make the exchange, and stepmother was left in that position. On one (1) occasion, stepmother had to call the police because mother was being so disruptive. This included mother yelling at stepmother in the presence of the children that *"you are the husband stealer "*. She would then yell to other people she would see nearby stating that *"if you have a husband, you had better look out "*. On another occasion, the children returned accusing stepmother of killing their puppy. However, the Court learned from stepmother's testimony that the parties acquired a puppy that had medical problems from the beginning. The parties went through considerable effort to find out what was wrong with this puppy and to keep the puppy alive.

Stepmother also reported that Robert was often reluctant to go to bed when he returned from visits with his mother. He would often be up four (4) or five (5) times a night, being unable to sleep. Stepmother believes that this is because Robert had become used to sleeping in the same bed with his mother.

Stepmother also reported certain circumstances, which if true, would give the Court great concern. Apparently, stepmother's daughter, Cara, presented her mother with a bracelet on this day of trial. The reason Cara presented her own mother with this bracelet was because Robert and Reese had told Cara that they would be leaving. According to Cara, Robert and Reese told Cara that their mother had told Robert and Reese that they were going to talk to a Judge on Tuesday, that the Judge made a mistake in his previous Order, and the children would be going back to Virginia with mother. According to stepmother, Robert also went to see his latch key provider to say goodbye.

Robert communicated to Kelly that if there was going to be a change, Robert wanted to finish out the school year in his present school. According to Kelly, if the children remained with father and Kelly, Robert and Reese will continue in the same schools in the Milford school district, and Scott and Cara will continue in the same schools they are in, that being the Caesar Rodney area.

Kelly testified that there had been no problem with Robert's encopresis from April until December of 2001. However, when the problem reoccurred in December of 2001, Kelly reported that Robert told her *"I want Mommy to come, and she will take care of this "*. Kelly indicated that she discussed Robert's encopresis with Dr. Scott, Robert's pediatrician. Dr. Scott advised Kelly to make sure that Robert took ample time to go to the bathroom, and to

also ask the teachers to make sure Robert has time to go to the bathroom before he gets on the bus. The doctor also recommended therapy.

It was interesting that Kelly reported that she has a good relationship with Meema, Robert and Reese's maternal grandmother. When mother did not appear for the Christmas visitation, as earlier described, Kelly contacted Meema. At one (1) time in the past, Meema thanked Kelly for showing proper discipline to the children, so that they would not further jump on the furniture. Kelly also reported that Meema expressed concerns directly to Kelly of her fears to be able to have access to the children, if she expressed the truth about her daughter, Linda. According to Kelly, Meema had told her that she believed that the children were better off with their father and Kelly than with mother, but she could not say so. Meema denied making such statements.

Kelly also described the childrens' father's relationship with all of the children. Father never hits any of the children. He is simply able to be firm in discipline by his manner of talk and looking at them. Kelly notes that her children love father. If her children have questions on the computer, in math or science, they go to father. Kelly's daughter Cara likes to get father's opinion on her nail polish.

In Kelly's opinion, she believes the children need structure. She also believes that the adults all need to get along for the benefit of these children.

As to Kelly's feelings about mother, she has concerns that mother would try to turn the children against her. Kelly indicated that she did not believe she was an issue during the parties' marriage. However, given the statements made by mother about Kelly in the presence of the children and others, it is clear that mother wants to make Kelly the reason the marriage fell apart. Mother appears to want to ignore the obvious and considerable stressors that were involved during the parties' marriage, beginning with the death of Christine. In Kelly's opinion, she believes it is okay if the childrens' mother does not like her, but it is wrong for the childrens' mother to try to turn them against Kelly. Kelly believes that in time, mother's hatred should become tolerable and all should be able to move on.

The Court next heard the testimony of Jake Bryant, mother's nineteen (19) year old son. Jake presently resides with his father in Norfolk, Virginia. When Jake entered the court room, the Court observed that his shirt was not tucked in.

According to Jake, his mother *"barely knew Bill when he moved in."* At first Jake liked father like an older brother. This was all around the time when Jake was in fifth (5th) and sixth (6th) grade. Jake then reported that father would become a different person when his mother was not around. Jake reported that father liked to keep to himself rather than keep Jake and Stephen happy.

Jake also reported that he observed arguments between his father and mother and that they became more frequent as time passed on. These arguments were usually over money, as well as over Jake and Stephen.

Jake also discussed his overdose of Tylenol, which led to his hospitalization and eventual follow-up psychiatric care for one-and-a-half (1-½) weeks in a hospital. Apparently, Jake had tried to smoke marijuana and also had brought some seeds into the house so he could grow them. Father searched Jake's room and also called the drug dealer whose telephone number father had found in Jake's belongings. According to Jake, father was livid about the discovery of the drugs which he found in

Jake's room near the end of Jake's eighth (8th) grade year. As a result, father's punishments were very strict, which included taking Jake's door off of its hinges, removing Jake's television from his room and not allowing Jake to eat dinner with the family. According to Jake, he felt like his life had ended and he therefore pursued the overdose.

Jake also reported that the general scheme of things involved the boys having various chores, such as washing the dishes and their own clothes. While these activities were going on, Jake reported that father sat on the couch. Jake acknowledged, however, that father did the cooking and father and his mother did the grocery shopping, although the shopping was mostly done by his mother.

Jake, who has very short hair, cut Robert's hair, because that was the way Robert wanted it. According to Jake, his mother gave him permission to cut Robert's hair.

Although Jake indicated that he saw his mother frequently, and also saw Robert and Reese every time they came to visit, Jake did not know his mother's work schedule. Jake was also unable to report about the interaction between Robert and Reese and the cousins who live across the street from his mother's home. According to Jake, he did not have too much time. Jake also indicated that he saw his mother two (2) or three (3) times a week. He said that he had dinner with his mother when Robert and Reese were down, but other than that, he did not have dinner with his mother.

Jake also described that his grandfather had a stroke. Although he used to see his grandmother and grandfather almost every day, Jake reported that he does not see them much now. Jake did report that his grandmother is *"doing better."*

Jake communicated his understanding that father left his mother for another woman.

At the conclusion of Jake's testimony, Jake acknowledged that he could not stand looking at father. He further stated that the thought of killing father had crossed his mind.

The Court next heard testimony from mother's friend of many years, Jane Gilligan. Ms. Gilligan resides in Chesapeake, Virginia, and has been mother's friend since mid 1991. She knew father and she also knew Jake and Stephen, as well as Robert and Reese. Mother and Ms. Gilligan have been coworkers in the same hospital since 1991 except for times when mother had moved to Delaware and also when Ms. Gilligan had moved to Richmond, Virginia from November of 1994 to November of 1995, when she moved back.

Although Ms. Gilligan was able to describe mother's interaction with Robert as appropriate, she was unable to describe father's interaction with the children, because she usually only saw him when father came home for dinner and then left for work.

Ms. Gilligan was living in a different city when Christine died, so she was not able to do much for mother. She recalls that mother went right back to work at Childrens' Hospital at the time. Ms. Gilligan testified that she believed that mother has moved on from Christine's death.

Ms. Gilligan recalled a six (6) month period when mother and the children moved from Delaware and lived with Ms. Gilligan and her husband. She observed during that time that mother was excellent with the children and played many games that were appropriate. Over the years, Ms. Gilligan has watched the children for mother.

Ms. Gilligan described mother's present living quarters in Virginia as a downstairs apartment containing a kitchen, living room and three (3) bedrooms. Apparently, mother used to live in the upstairs apartment in the same house, which had a common entrance way. Ms. Gilligan, who works at the same hospital where mother works, reported that the hospital is so short-handed that mother would have no trouble getting flexible hours from the hospital.

Ms. Gilligan concluded that she had observed Jake in the waiting room of the Court house stating that he hated father and that he would like to kill father.

The Court began its third (3rd) day of trial with the testimony of Lisa Martin, the mother of Robert and Reese. Lisa Martin testified that she is forty-four (44) years of age, in good health, has no mental problems at this time, and resides in Chesapeake, Virginia. Her home in Chesapeake, Virginia is a two (2) story, single family residence divided into two (2) apartments, located in an older established neighborhood which is identified as a historic district. Mother has resided eleven (11) months at this address and mainly occupies the downstairs apartment, but also has access to the upstairs. No other people live in the house, and she would only allow a relative to live in the house, such as her son Jake, or her son Stephen.

Living across the street from mother is her cousin, forty-three (43) year old Dana Barnes, who has three (3) children at home, ages seven (7) through fourteen (14).

Mother is presently employed as an emergency room technician on Fridays, Saturdays and Sundays from 7:00 p.m. to 7:00 a.m.

As mother answered various questions, the Court could not help but recall Dr.

Wilson's testimony about mother making very complicated answers of what should have been simple answers. For example, mother's own attorney asked mother what her work schedule would be if she had the children. Mother's answer was that her work schedule would be what the Court wanted her to do. She then went on to say that if she had the children, she would continue to work on weekends. Two (2) of the weekends when she was working, the children would be visiting with their father, one (1) of the weekends the children could be watched by her mother, and one (1) of the weekends the children could be watched by their older half-brothers, Jake or Stephen. Of course, mother's work schedule and ability to share visitation with father did not account for possible travel time or the exchanges mother might have to make while she was working.

Another example of mother's inability to respond directly to a question was when her own attorney asked her how visits went since the Court's last Order. Mother's response was that she admitted there were times when she had been late. She then went on to say that she did not have a cellular telephone, and that she could not use a phone card because father would not answer the phone. She went on to say that she was paying for tolls and gas and wear and tear on the car. Thus, mother did not directly answer the question placed to her, but, instead, seemed to give excuses for problems she might have caused on her own part in making the exchanges in visitation.

Mother was also asked why she missed her Court-ordered Christmas visitation. Mother stated that, because father would not return her phone calls or answer her e-mails, she assumed that he was not going to allow mother to have her Christmas Eve visitation. This does not make sense, however, when one considers that father had

been on time for every visitation exchange since the Court's Order a year ago, and had never deprived mother of her visitation, nor had ever told her that she could not have her visitation.

In another question, mother was asked by her own attorney, when did she and father separate. Instead of answering the question, mother responded that when she got married, she had told her husband that she loved him and that it would last forever. Mother then went on with a long explanation about how she had been attempting to encourage him to make love for several months, but he refused. She went on to indicate one (1) night he was touching her, she responded, and then he laughed at her and left the bedroom and slept on the couch thereafter. Returning to the simple question of when separation occurred, under cross-examination, mother testified that she did not believe father's sleeping on the couch was considered separation, nor was her statement in her PFA filed in October that they had had no sex for three (3) months a sign of their separation prior to their actual physical separation following the PFA.

During part of mother's testimony, she acknowledged that father did not know her exact address for about half of a year. Mother's response to why she did not let father know where she lived, was that she was afraid that father might show up and be mad at her. This response did not seem to make sense, since father had not been a problem before.

Mother also acknowledged that she told her older son Jake that she would need to get father's permission before giving Robert a very short hair cut. According to mother, she told Jake that she would ask father first, because it was a "drastic" move to cut Robert's hair that short. However, mother confirmed that she never actually got around to asking father's permission about the hair cut.

Mother was asked on cross-examination if placement were to remain with father, would mother continue to have her children sleep in the same bed with her. Instead of answering yes or no, mother's answer was that if she received more time, she would change.

Although, as earlier noted, mother testified in response to her own attorney's question that her work schedule would be what the Court wanted her to do, mother then eventually said that she planned to continue to work weekends. Mother also testified that she had great flexibility in her work hours. Despite mother's suggestion of the great flexibility in her work hours, mother admitted that in her monthly visits in January of 2002 and April of 2002, she was unable to get off for those visits. In response to questioning on this subject, mother stated that she sometimes forgot to tell her scheduling nurse that she needed the weekend off. The Court has concerns that mother failed to deem it important enough to make these arrangements so that she could have her visitation on her monthly Court-ordered visits. Furthermore, it was pointed out in cross-examination that for mother's important meeting with Dr. Wilson more than a year-and-a-half ago, mother chose to work an all-night shift, travel to Delaware and pick up the children and meet with Dr. Wilson in the afternoon, rather than adjusting her work schedule so she could have worked on another day, and been in Delaware well-rested for this important appointment.

Mother testified that she missed her Court-ordered Thanksgiving visitation because visitation was not "feasible timewise." Visitation under the prior Court Order would have allowed mother visitation on Thanksgiving Day from 9:00 a.m. to 6:00 p.m.

Mother reviewed the history of first meeting father in 1992, and living for three (3) years together before getting married. Mother was married at the time she met father, although she had separated earlier in January of 1988. Mother testified that she did not get a divorce because her former husband was in the active military, and she used his ID for medical and commissary purposes. She acknowledged that she and father were sleeping together in May of 1992, and that he moved in to her home in August of 1992, where they shared a two (2) room apartment with her children from her previous marriage. As mother acknowledged, she allowed father to move into her home even though her son Jake correctly testified that they hardly knew father when he moved in.

Mother described episodes of Robert's encopresis. According to mother, she attempted to get Robert to a therapist within the last year, but the therapist told her that it was useless for her to bring Robert to him because she only had one (1) weekend a month. Mother acknowledged that she did not tell father about taking Robert to a therapist, and mother could not recall the name of the therapist. If the Court understood mother's testimony correctly, and this was somewhat confusing in her answer, the Court believes mother also indicated that the therapist had told her that the encopresis was normal. Mother stated since January of 2002, Robert had three (3) or four (4) occasions of encopresis which would usually occur shortly before she would return Robert to his father. It should be noted that father had testified that the encopresis problem had pretty much disappeared, until the Christmas Eve episode when mother failed to appear for her Christmas Eve visitation. Robert had brought a present for his mother and was waiting to see his mother while waiting with his father at the Pocomoke exchange place. When mother did not appear, Robert then experienced another episode of encopresis in father's presence.

Mother was then asked to comment upon her feelings about her son's Jake's earlier testimony, particularly about Jake's statements that he wanted to kill father. Basically, father's attorney questioned whether mother thought this was a healthy statement. In response to that question, mother testified that she felt Jake was very brave in testifying and that father's attorney had "badgered" Jake into making that statement. However, it is noted that Jake made the statement to another witness in the waiting room, and father's attorney simply asked Jake to confirm the statement under oath in Court. Mother also acknowledged that Jake had never told her about the depth of his complaints about father, and that the first she heard of them was when Jake testified at the hearing. It is also interesting to note that Jake's statements were not hating father because of what father had done to Jake, but instead what, according to Jake, father had done to his mother.

Prior to meeting father, mother testified that Jake and Stephen would have chores such as putting their clothes away in their dresser, being sure their rooms were cleaned up, and picking up their clothes from the downstairs. When father came into the marriage, mother acknowledged that Jake and Stephen would then have to wash dishes, do the laundry and mow the lawn.

Mother also gave testimony about the PFA that she filed on October 15, 1999. Most of the complaints in the PFA were about mother's allegations that father was having an affair, in that he was taking the children to visit the babysitter, Kelly, and that one (1) of the children, when she picked the child up, would call out Kelly's

name. There was also discussion in the PFA about a name plate. In the Court's estimation, none of these complaints would rise to the level of a finding of abuse. The only allegation that would rise to that level would be the allegation by mother that father had grabbed and twisted mother's wrists during an argument. Father denied this allegation. Mother had no other testimony to confirm this allegation, such as testimony by others of bruises or photographs of bruises. Furthermore, other than mother's mere allegations as to father's pre-separation adultery, mother presented no convincing evidence suggestive of any improprieties between father and Kelly prior to father and mother's separation.

Mother admitted to making statements in the past in front of the children that identified Kelly, the stepmother, as a husband stealer. However, mother then testified that "she stopped [making such statements] because she was starting to get herself together". According to mother, she had now made her peace, and she was now telling Robert and Reese that she liked Kelly, and that she liked having Kelly taking care of them. The Court found this difficult to believe, however, when almost in the same breath of testimony, mother stated that she had been humiliated by her ex-husband because he had used "his mistress" to handle exchanges of the children. Mother also stated that she had no anger towards her ex-husband at this point. Yet, in part of her testimony, when describing how Kelly first came to be their babysitter, mother stated *"he gave me some story about needing a babysitter at work"*. Even when suggesting that her ex-husband was "taunting" her by having "his mistress" drop his children off at the police station for an exchange, mother acknowledged that Kelly was only involved in these exchanges because father could not be involved because mother was late.

Mother went on to agree that she was frequently late for things.

One important piece of information that the Court learned through mother's testimony was that Kelly's oldest son, Scott, was the result of an affair Kelly had several years ago with a doctor, and this was not denied by father nor Kelly.

Mother indicated that since the hearing of a few days before, she had looked into a school in Virginia, the Betty F. Williams School, which allows year-round schooling and is in a very flexible school system. If mother were to get placement of the children, she would like father to have visitation of every other weekend, split the summer, and also split the school breaks, which are frequent throughout the year.

Mother also testified that the sleeping arrangements she has when Robert and Reese come to visit with her are that the children start out sleeping in mother's bed, and she then moves them to their own bed. This was slightly different than the testimony of Robert who stated that he and Reese start out in their own beds and then go to their mother's bed because of Reese's fear of the dark.

Mother also testified that she and father would often open up each other's mail. She found it curious that on the time she opened up the mail that contained the name plate with Kelly's initials, that father became very angry. Although father indicated that this was a mistake, mother's testimony as to father's response as to why he was so angry was that *"I'm going to marry her."* Father denied making this statement.

Mother acknowledged that she is aware of the Lulu Robinson School, which the children presently attend, and she agreed that it is a good school. Although mother contacted the school to find out when Robert's vacations were, mother acknowledged

that she never contacted the teachers to talk with them about Robert's progress.

Mother testified that Jake is presently attending therapy.

According to the Support Order issued April 5, 2002, mother is in arrears in the amount of $6,303, and she has a monthly obligation of support in the amount of $622 a month plus payment on the arrears, for a total monthly payment of $750. Mother acknowledged that since the date of the Order, she has not made any payments. Mother has filed a Review of the Commissioner's Order which is still pending.

Final witnesses were called as rebuttal witnesses. First of all, Ms. Porter, the maternal grandmother, denied that she ever had a conversation with stepmother wherein she admitted that the children would be better off with father. Ms. Porter also stated that she did not have a close relationship with Kelly, and that she did not call Kelly for advice. Ms. Porter further stated that she *"would have no reason to talk to Kelly with what she has done to my daughter."* Thus, it was clear to the Court that Ms. Porter had adopted her daughter's belief that Kelly "stole" mother's husband away from her.

Ms. Porter recalled that Kelly had called her on one (1) occasion to ask where mother was, and that it could have been on Christmas Eve when mother was working. Ms. Porter also acknowledged that she had given father and Kelly a wedding gift.

Kelly Martin then testified that she called Ms. Porter one (1) time on Christmas Eve, in which conversation Ms. Porter indicated her understanding that father was not permitting mother to have Christmas Eve visitation. Both father and stepmother had denied ever making a statement to mother that she could not have visitation. In fact, mother also never stated that father nor Kelly said she could not

have Christmas Eve visitation. Mother's sole excuse for not appearing on Christmas Eve was that father had never called her back.

Father then admitted that he had taken everything he could think of away from Jake when Jake was found with illegal drugs. Father testified that he had discussed with Jake and Stephen the use of illegal drugs, and that it was prohibited. He indicated that both he and mother were against the use of drugs. Father indicated that he was especially against it because of his childhood where his parents used drugs. Father also testified that mother was included in, and agreed with, the decision of taking things away from Jake. Father also acknowledged that he called the drug dealer upon finding that number. He stated that he first talked to the drug dealer's father and told him of the situation, and then spoke to the drug dealer and told him to stay away from Jake. The dealer acknowledged that he knew Jake.

Father also testified that he had Jake and Stephen do the laundry and dishes and that Jake was thirteen (13) years old when he mowed the lawn. Father denied that he simply sat on the sofa while the boys did their chores. He did not think these chores were too much for the boys. He also denied ever pushing Jake over the lawnmower. In fact, according to father, Jake loved mowing the lawn. There was one (1) occasion, however, that he acknowledged that he made Jake cut the grass until dusk, because Jake had tried several delaying tactics that day to get out of doing his work.

According to father, the Support Order was issued on April 5, 2002, and since that date, he has not received any support payments. Father's income was calculated at $44,664 per year. The arrearages were approximately $6,300. According to fa-

ther, mother's income was $29,500 in 2001 and the Court anticipated that she would make $32,000 in 2002. The percentage ratio determined by the Commissioner under the Melson formula was fifty-six percent (56%)/forty-four percent (44%).

Father testified that he never denied mother her Court-ordered visitation. He further testified that he had never been late for the exchanges. Even though he arranged for time slots for mother to call every weekend, which mother acknowledged, she very rarely called. Father also denied that he required top-of-the-line gadgets. Instead, he testified that he often passed up things so other members of the family could have things they wanted.

Although mother testified that father was out of work for about three (3) months when he separated from the Navy, father testified that after his Honorable Discharge from the Navy when they were reducing their force, he was out of work for approximately two (2) weeks when he started working with the Portsmouth emergency squad.

Father also denied that he had Kelly over for dinner and only he and she ate the meal, while mother and the children watched. According to father, Kelly was, indeed, invited for dinner, but the entire family ate at the table with Kelly.

Father denied hitting or squeezing mother's wrists as she alleged in the PFA.

Father confirmed that his present wife was only involved in exchanges of the children when it was absolutely necessary because he had to go to work and mother was late for the exchange.

## LAW AND REASONING

Pursuant to Title 13, Section 701(a), a father and mother are the joint natural custodians of their minor children, and are equally charged with their childrens' support, care, nurture, welfare, and education. Where the parents live apart, it falls upon the Court to determine who the children shall primarily reside with, and also to set forth the schedule of visitation consistent with the childrens' best interest and maturity, which is designed to permit and encourage the children to have frequent and meaningful contact with both parents.[6] Regardless of who is awarded placement, all parents and other persons are encouraged to foster ... frequent and meaningful contact, in person, by mail and by telephone, between parents and children ..."[7] If the Court finds that this obligation is violated, the Court has the power to remedy this violation by awarding, among other things, extra visitation, a temporary transfer of custody or primary residence, a fine, and even, imprisonment.[8]

In making its decision as to the placement of these children, the Court did not presume that one (1) parent, because of his or her sex, was better qualified than the other parent to act as the primary residential parent.[9]

The Court is required to consider each of the factors set forth in Title 13 Section 722 as well as any other relevant factors the Court may deem appropriate. The Court must consider each factor independently and then give each individual factor *"its due weight and importance relative to the other factors in a manner reflecting the best interest of the child in question."*[10] The Court does not adopt a

---

**6.** Tit. 13, Section 728(a).

**7.** Title 13, Section 728(b).

**8.** Ibid.

**9.** Title 13, Section 722(b).

**10.** *Holmes v. Wooley,* Del.Supr., 2002, Holland, J., Berger, J. and Steele, J., 2002 WL 27436 (Jan. 3, 2002).

"mechanical or perfunctory approach" whereby each factor is weighed equally, and the child's best interests are resolved by placing the child with the parent who prevailed on the most factors.[11]

In making its decision on the proper placement for Robert and Reese, the Court considered all relevant factors to determine the best interest of the children, including the following factors set forth in title 13, Section 722(a):

***Parents' wishes and residential arrangements:*** Both parties agreed that they should share joint placement. The Court notes that the parties have had great difficulty in communicating. Mother blames father for failing to respond. At the same time, however, noting the anger that mother has exhibited, at least in the past, the Court can somewhat understand why father has not responded. The Court also notes in its own observation that the way these parties responded was quite different. When asked a question, father gave a direct and concise response. Mother, on the other hand, often had difficulty giving a direct response, and it was often difficult for the Court to understand mother's response. Despite the difficulty in communication between these parties, they both clearly have their childrens' interests at heart. Therefore, a joint award of custody is certainly appropriate, but the parties need to work on their ability to communicate with each other.

Both parties also agreed that, whatever the outcome of this case, mother should have more time with the children than the one (1) weekend per month previously awarded to her in the Court's prior Order dated April 4, 2001.

Both parties also desire primary placement of the children. It is father's wish that the children remain with him. He would also like mother to have ample visitation with the children, including every other weekend, extended summer vacation, and a sharing of holidays. Father would also like to involve the children in therapy, and also to include mother in those sessions. Father wants the visitation exchange place to continue to remain the police station in Pocomoke, Virginia. Because of the numerous times mother has been late, or has even failed to show, father would like mother to be required to telephone father just prior to her leaving for Pocomoke, so that father would know that she is actually going to show up, and approximately when she will show up.

Mother is seeking primary placement of the children. It is mother's plan to enroll the children in a year-round school. Mother would agree that father should have every other weekend visitation, and also one-half (½) of all the school breaks. Mother also believes that father should have frequent telephone contact. Furthermore, mother's attorney, in her closing, offered the suggestion that any Order made by the Court be a Temporary Order, which would be reviewed in approximately six (6) months after all of the parties and the children have undergone counseling.

It is the general feeling of the parties, the expert witnesses in this case, and the Court, that the children and the parties, including stepmother, should all undergo counseling together. Certainly, the purpose of the counseling for the children should initially be to address Robert's encopresis. The counseling between the parents should be to discuss how they can better communicate with each other in the best interests of the children.

Father presently resides with his wife, Kelly, along with Kelly's two (2) children, Scott, age ten (10), and Cara, age eight (8),

---

11. Ibid.

along with father's two (2) children, six (6) year old Robert and almost five (5) year old Reese. Father's household includes two (2) dogs, two (2) cats, and two (2) fish. Father and Kelly started living together just shortly before Thanksgiving of 1999, and they married in December of 2000. The land for the present home on which father and Kelly and their combined families reside was purchased solely by Kelly in April of 1999. She then had a house built on the property which was completed in January of 2000. At the time, Kelly had not envisioned that she would be living with father and his children, and her house was built to accommodate herself and her two (2) children. Both father and Kelly agree that their present home provides tight quarters for the family. The home has three (3) bedrooms. One (1) bedroom, the master bedroom, is presently used by mother's daughter, Cara, and is shared with the parents who sleep on a mattress on the floor. Robert and Reese have their own beds, sharing a second (2nd) bedroom, and Scott has the third (3rd) bedroom to himself. Prior to January of 2002, Cara had her own bedroom, which is now used by Robert and Reese, and Robert and Reese slept on the floor on a mattress in the same bedroom where the parents slept in a bed.

Father and Kelly have made attempts to move to a different residence which would be larger, as well as being located in Sussex County. Father's employment as a Sussex County paramedic requires him to reside within Sussex County. Unfortunately, father and Kelly's valid attempts to acquire another residence have thus far been unsuccessful. However, they continue to look for other housing.

Father has been employed as a Sussex County paramedic since some time in 1996. Father's present wife, Kelly Martin, is presently employed at the Bay Health Medical Center in Milford, Delaware in the office of registration and admissions.

Mother presently resides in Chesapeake, Virginia in a two (2) story, single family residence divided into two (2) apartments, which is located in an older established neighborhood which is identified as a historic district. Mother has resided for eleven (11) months at this residence, and mainly occupies the downstairs apartment, but also has access to the upstairs. Mother resides alone in this apartment. Previously, mother's landlord occupied the lower level of the building, while mother occupied the upper level. Robert and Reese have their own bedroom in mother's residence. Furthermore, the property is across the street from mother's forty-three (43) year old cousin, Dana Barnes, who has three (3) children in her home, ages seven (7) through thirteen (13).

Mother is presently employed as an emergency room technician on Fridays, Saturdays and Sundays from 7:00 p.m. to 7:00 a.m. She has her weekdays free.

The Court heard a considerable amount of testimony from the parties, as well as the expert witnesses, about the sleeping arrangements in the respective homes. Until January of 2002, Robert and Reese slept on a mattress on the floor in the room occupied by their father and stepmother. According to father and stepmother, they felt that, given their limited sleeping accommodations, that Scott should have his own room and stepmother's daughter, Cara, was used to having her own space. Father and stepmother felt, however, that Robert and Reese would be better off together, so they shared space in the room with father and Kelly. Furthermore, it was admitted by mother that she had made statements in the childrens' presence at various times, angrily, that Kelly was a "husband stealer". Kelly and father felt it necessary that

these young children be close to their father so that they would not have concerns about him not being there. Father and Kelly stated that it was their plan when they moved into a larger home, that Robert and Reese would no longer be in the same room, and that they would make these changes at that time. However, as noted previously, the various attempts to purchase housing by father and stepmother have thus far failed, and they therefore decided in early January of 2002 to put Robert and Reese in their own room, which they share, but having separate beds. They then determined to move Cara into the master bedroom, with Cara using the bed and father and stepmother sleeping on the mattress on the floor. Both father and mother adamantly denied that they had ever had sex in the same room when the children were in the bedroom. Instead, they found other places in the home to pursue their intimate relations without the children being present.

Although mother's house has ample space for each of the children to have their own bedroom and bed, the children spend a considerable amount of time sleeping with mother in her bed. According to mother, she starts the children sleeping with her, and then moves them to their own beds. According to Robert, however, each of the children start out in their own separate bed and then gravitate to mother's bed because Reese is afraid of the dark.

According to each of the psychologists, Dr. Kingsley and Dr. Wilson, neither of these situations are the best for the children. If one had to choose, however, Dr. Wilson preferred the scenario where the children were sleeping on a mattress on the floor with the parent or parents in the bed. It was Dr. Wilson' opinion that the most damaging of these scenarios was allowing these children, now getting older, to sleep in the same bed with the parent. It should also be noted, that Dr. Wilson did not believe that it was in the childrens' best interests for them to sleep on a mattress together in the same bedroom with the parents for three (3) years. In the case of father and Kelly's situation, Robert and Reese had been sleeping on a mattress in the bedroom with father and Kelly from November of 1999 until January of 2002. Although Dr. Wilson was questioned whether he thought it preferable to have the two (2) stepbrothers placed in the same bedroom together, and the two (2) stepsisters placed in a bedroom together, Dr. Wilson noted that there could be a security factor between Robert and Reese which would favor keeping Robert and Reese together in the same bedroom, rather than the more culturally-appropriate suggestion of same sexes in the same bedroom. Dr. Wilson was concerned that if Robert was continuing to sleep in the same bed with his mother, it could adversely affect Robert's abilities of separation and individuation.

In sum, each of the parents have adequate housing for these children, although father's situation presents a tight squeeze on the sleeping arrangements. Father has been actively seeking another residence. Father has been making choices for the sleeping arrangements of the children which he and Kelly had given some thought to, which would be in the best interests of the children, given the limited space. Mother, on the other hand, although having ample opportunity to keep the children in their own beds, chose to place the children in bed with her. The Court suspects, however, that neither of these parents appreciated the possible harmful effects of these sleeping arrangements upon the children until after hearing the psychologists' testimony.

*Childrens' wishes:* The Court interviewed both Robert and Reese. Because of the young age of both of these children, the Court intends to pay minor significance to their wishes. Frankly, Reese offered little, if anything worthy of discussion. The only thing the Court noted in particular about Reese was that she was able to communicate with the Court, but was unwilling to communicate with Dr. Kingsley while sitting in her father's lap. It should be noted, however, that Dr. Kingsley testified that Reese is involved in a normal stage for a young daughter as she relates to her father, known as the "Electra" stage, where a young girl of Reese's age is very attached to her father, and that disruption of that attachment at this time might lead to certain insecurities about Reese's self-image in the future.

Although only fourteen (14) months older than Reese, Robert was able to express much more information to the Court, although he was squirming in his chair most of the time during the conversation with the Court. It was clear that Robert liked school, going on school trips, playing outside, and cooking with his father, as well as playing with his stepsister and stepbrother, Cara and Scott. Robert was also able to describe the various sleeping arrangements he had in the homes of his respective parents.

Robert told the Court that his stepmother had said she thought Robert should spend more time with his birth mother. Robert also told the Court that his father had told him that his mother and he were not friends anymore.

Robert indicated that he liked going fishing and practicing fishing with his mother, and he also noted that he sees his grandmother when he visits his mother. Robert indicated that he likes his half-brother, Jake. Concerning his half-brother, Stephen, however, he indicated that Stephen had been mean to Robert on several occasions. Although Robert was unclear as to exactly what he meant, it appeared that Stephen was undergoing some type of serious grounding-type punishment for something Stephen had done. The Court notes that mother presented extremely minimal testimony about Stephen. Furthermore, Stephen did not attend the trial to give testimony.

Robert was quite clear that he wanted to spend more time with his mother. He had also given the same indication to Dr. Kingsley. In fact, all parties agreed that Robert should spend more time with his mother. Although not absolutely clear, Robert's testimony suggested that he wanted to live primarily with his mother, when he stated to the Court that he wanted to be with his mother on Friday, Saturday, Sunday, Monday and Tuesday, and then with his father for two (2) days.

Clearly, the testimony of the parties, Robert's wishes, and confirmation by the two (2) psychologists, suggested a need for Robert to spend more time with his mother. Considering Robert's wishes alone, this element favors placing Robert primarily with mother. However, considering the closeness between father and Reese, noting the "Electra phase" of Reese's development as discussed by Dr. Kingsley, and also noting the close relationship between Reese and Robert, Robert's apparent wish to be with his mother is certainly offset by several other mitigating factors as they relate to Reese's placement.

*Interaction and interrelationship of children with significant others:* The strength of father's arguments concerning the interplay between Robert and Reese and the interaction with significant others lies in his marriage to Kelly and the close relationship Robert and Reese have with Kelly and Kelly's children, Scott and Cara. According to Dr. Kingsley, Robert was

close to his stepmother. Robert also liked to cook with his father and stepmother. Dr. Wilson, in his observation of the family almost two (2) years ago, saw a close interaction between all of the children in father and Kelly's household, and also noted that Kelly was "an impressive" parent. In addition to the immediate family in father's household, Robert has a close friendship with another child, Bianca, whom he has known for several years through day care. Also, the children have a long-standing relationship with their day care provider.

Father's clear weakness in this area of consideration is that there is no extended family on father's side. The paternal grandfather died in 1997 when he was fifty-three (53) years of age. The paternal grandmother is disabled and presently lives in Ohio. Father did not discuss his parents very much, possibly because of what father had related to Dr. Kingsley, that being that the paternal grandmother may be an alcoholic, and that father's parents were hippie types. Father also has a sister, Laura, who is thirty-two (32) years of age, married, and the mother of one (1) child. However, Laura lives in Wisconsin, and again, there was very little testimony, if any, about any significant interaction between the children and their aunt.

Within the home itself, however, the testimony of father and Kelly suggested that the immediate family unit of father and Kelly and their respective children, is a happy and healthy unit, with all children having various routines. The family is a busy family which attends YMCA swimming, school fairs, music and phonics classes, and takes walks in the park together. Father likes to cook, and Kelly enjoys assisting him. The family always sits down and eats dinner together. It was clear from the testimony, and also as confirmed by the psychologist, that father is a very secure and stable individual, who has definite concepts about how the children should be raised, and carries through with those concepts. This Court's observation of Kelly in her testimony, and Dr. Wilson's testimony about his observations, also confirmed that Kelly contributes to this very structured, consistent and caring stability for these children.

The strengths of mother's argument lie in the fact that she has extended family living near her in Virginia who are able to assist her. It is clear that Martha Porter, maternal grandmother, has had a considerable amount of involvement in these childrens' lives since their birth. Martha Porter continues to express an interest in assisting her daughter in caring for these children, and certainly lives close enough by mother to do so. Although Ms. Porter states that her health is good, it is certainly evident that she suffers from some medical problems, which include diabetes to the level where she needs to take insulin, recent surgery for the removal of one (1) of her toes and hospitalization several months ago for circulation problems. Ms. Porter's seventy-one (71) year old husband, the maternal grandfather, had a stroke and uses a walker. Despite these afflictions, the Court feels sure that Ms. Porter will continue to assist her daughter in helping raise these children, and that Ms. Porter continues to have the ability to do so.

Mother also has a brother, John Porter, III, who is forty-two (42) years of age and is a laborer who lives near mother. John is married with two (2) biological daughters and one (1) stepdaughter. Mother also has a sister, Nina Maier, who has been divorced for several years, is forty (40) years of age, and the mother of two (2) daughters. Nina lives in Florida. Mother also has a brother, Daniel Porter, who is thirty-seven (37) years old and divorced. He has one (1) child who does not

live with him. He is a laborer and works near mother. According to father's testimony, however, Daniel rarely saw the children while father was living with mother in Virginia and the children only sporadically saw John.

It is also noted that mother's forty-three (43) year old cousin, Dana Barnes, lives across the street from mother's present residence. Dana has three (3) children at home.

Finally, mother's two (2) other children, Jake, age nineteen (19), and Stephen, age seventeen (17), live close to mother. Mother testified that Jake and Stephen visit her frequently, and have good interaction with Robert and Reese. Mother presented extremely little testimony about Stephen. The only thing the Court really knows about Stephen is that, according to Robert's statements, Stephen has been mean to Robert, and may have been grounded for some type of problem. The Court places little emphasis on Robert's statements, but does note that it was strange that more was not said about Stephen and the types of activities in which he is involved. Jake gave testimony. Although Jake testified that he spends a frequent amount of time with his mother and the children, the Court found it unusual that Jake did not know his mother's work schedule, nor did he dine with his mother much, nor was he able to comment on the interaction he might have observed between Robert and Reese and the cousins who live across the street.

Thus, having had the opportunity to observe the testimony and demeanor of the witnesses, the Court does not believe that Jake nor Stephen spend that much time with Robert and Reese, nor with their mother. The Court does believe, however, that Ms. Porter, maternal grandmother, has been considerably involved with her grandchildren, and will continue to do so.

Thus, while father has a closely knit immediate family involving his wife and their children, mother offers an extended family of an attentive grandmother, cousins, and infrequent visits by aunts and uncles and half-siblings to Robert and Reese.

When considering the interaction of relatives on mother's side of the case, the Court has a major concern. That concern is how mother's relatives are portraying to Robert and Reese their father and their stepmother, Kelly. Mother has admitted that there were times earlier when she told the children, or others in the presence of the children, that Kelly was a "husband stealer" and that Kelly was her husband's mistress. The maternal grandmother, who admitted that she had given father and Kelly a wedding gift, indicated that she was upset by what father had done to mother. Mother's son Jake was the most extreme example of how mother has placed her hateful opinions of father and Kelly into the minds of others. Thus, Jake testified that he wanted to kill father. Jake did not say he wanted to kill father because of how father had treated him when Jake was living with father; instead, Jake stated that he wanted to kill father because of the way father had treated Jake's mother.

The Court believes that this hatred towards father and Kelly was placed into maternal grandmother's and Jake's minds by mother. Mother admitted having made these statements about Kelly being father's mistress, and being a husband stealer, in the presence of the children. The Court also heard testimony about at least two (2) occasions where mother appeared late for an exchange, and Kelly had to become involved in the exchange because father had to work. On one (1) of those occasions, mother was screaming and being so disruptive that Kelly had to call the police. When mother was asked about her

opinion of Jake's statements that he hated father and wanted to kill father, mother was not alarmed. Instead, mother applauded Jake's bravery in finally confronting his former stepfather. In the Court's opinion, these were extremely serious statements by Jake, especially considering they were made in a Court of law. Mother acknowledged that she was never previously aware of Jake's extreme hatred for father. In the Court's opinion, Jake's statements were not healthy, and mother's response to Jake's statements were not healthy or appropriate. The Court is aware that Jake is in therapy, and mother should suggest that Jake resolve with his therapist the seriousness of what he stated in Court. Furthermore, the Court has concerns about how Jake may attempt to influence Robert and Reese against father and Kelly. The Court also continues to have concerns about how mother might try to influence Robert and Reese against father and Kelly, despite mother's representations to the Court that she has put all of that behind her.

The inescapable conclusion, as this Court heard the testimony, is that the marriage between father and mother began to deteriorate almost immediately following the death of the parties' young child, Christine, who died after nine (9) days of life in January of 1995. Both parties admitted to Dr. Kingsley that Christine's death was the event that started turning this couple away from each other. Over the next four (4) years, these parties went through numerous stressful events which caused their marriage to deteriorate even further. This included employment changes for each of the parties, including one (1) year in which father commuted to Delaware from Virginia, and stayed four (4) days a week in Delaware. It also included a bankruptcy, a move to Delaware, mother's two (2) older sons choosing to leave mother to live with their father, the attempted suicide by mother's oldest son Jake, mother's failure to get a job because she was pregnant, as well as the follow-up litigation caused by the grievance filed by mother, questions of mother's job abilities in which husband, although trying to offer suggestions, was seen as taking the side of mother's employer, the death of father's father in March of 1997, and having to raise two (2) children born fourteen (14) months apart during all of this while both parties worked shift work and saw very little of each other. In this Court's opinion, mother fails to accept that Kelly had nothing to do with the deterioration and break up of her marriage with father. Perhaps mother blames herself. She should not. But neither should mother blame father, and especially, mother should not blame Kelly. It is the Court's opinion that the marriage, for all intensive purposes, had ended, except for the actual granting of the divorce decree, well prior to the beginning of the romantic relationship entered into by father and Kelly.

In discussing the interaction of the parties, the Court also believes it appropriate to discuss at this point the stability of the relationship between father and Kelly. Obviously, this Court does not have a crystal ball to look into the future to determine whether or not father and Kelly's marriage will succeed. This is father's third (3rd) marriage, and Kelly's second (2nd) marriage. Also, the Court learned that Kelly had an affair during her first (1st) marriage, which resulted in the birth of Stephen. In the prior trial on this case, Dr. Wilson stated that eighty percent (80%) of third (3rd) marriages end in divorce. However, Dr. Wilson recanted that statement. Instead, Dr. Wilson stated that statistics revealed that fifty percent (50%) of first (1st) marriages end in divorce. A greater percentage of second (2nd) mar-

riages end in divorce, and a greater percentage of third (3rd) marriages end in divorce than in second (2nd) marriages. The Court also notes that, should mother become remarried, it will be her third (3rd) marriage. Although the Court cannot predict the future, the Court observed the testimony of father and stepmother, and also the testimony of Dr. Wilson, who observed the couple briefly, and given this minimal opportunity of observation through the Court's own eyes and through others, the Court found nothing to suggest that this marriage between father and his wife is not a good one. Indeed, father stated to Dr. Kingsley that this time *"he finally got it right."* Mother presented no testimony to the Court that would have evidenced any problems between father and stepmother, such as witnesses to arguments, nor any temporary separations between father and stepmother, which, in the Court's understanding, have not occurred.

Of final concern regarding the interaction of significant others involves this Court's concern of mother's habitual tardiness. Mother and her attorney suggested that this was merely a housekeeping problem. Father, on the other hand, testified that he observed depression throughout his marriage to mother. Mother acknowledged that she was taking Zoloft for her depression, but seldom sought therapy. Dr. Wilson testified that a person taking Zoloft should also be seeing a therapist on a regular basis. At the same time, however, Dr. Kingsley felt that mother was appropriately coping with her depression. Whatever the case, the clear facts indicate that mother is regularly late. Father's records, undisputed by mother, indicated that for seventeen (17) available visitation times since this Court's prior Order of April 2001, mother failed to show and failed to call three (3) times, including Christmas Eve. Mother failed to show for Thanksgiving. Mother was more than one

(1) hour late on one (1) occasion, and more than a half hour late on three (3) occasions. The record also reflects that mother worked at least two (2) weekends when she had the children visiting her, despite mother's testimony about how flexible her schedule could be. In each case, father had driven these young children to Pocomoke with their expectations that they would be seeing their mother. For Christmas Eve, Robert had a special present for his mother. When mother failed to show, Robert suffered his first (1st) episode of encopresis in months. Mother's tardiness, where the hopes and expectations of these young children are concerned, is inexcusable. This Court cannot even imagine Robert's disappointment when his mother failed to appear on Christmas Eve.

The Court will also note that mother was more than a half hour late for at least two (2) of the four (4) days of the trial and closing arguments. Granted, mother had to travel from Chesapeake, Virginia to Delaware to attend. However, the Court would have thought that mother, under these very important circumstances, would have allowed ample time so that she would have arrived early, instead of late. Although mother's tardiness before the Court did not affect this Judge's decision, the Court cannot help but think that mother's frequent tardiness, and sometimes failure to appear, creates considerable anxiety, disappointment and harm in these young children.

***Childrens' adjustment to home, school and community:*** Robert is presently enrolled in the Lulu Morris School in Milford, Delaware. Dr. Kingsley had specific knowledge of this school, and stated that it was a very good school. Mother also agreed that the Lulu Morris School was a very good school. The Court should note, that it is difficult to understand how mother came to that determination. The only

time mother called the school was to find out when vacation times occurred. Mother acknowledged that she never called the school to speak with the principal or teachers about Robert's progress or the programs in which he was involved. Testimony also revealed that Robert and Reese have had the same day care center, provided by Carolyn Black, for several years. Furthermore, Robert has a very good friendship, which he has developed through the day care center, with Bianca. It appears inevitable that the father and stepmother will move at some time in the near future because father's employment as a Sussex County paramedic requires that he reside in Sussex County. The parties presently reside in Kent County. At the same time, father and stepmother testified that they will be looking for property in the Sussex County part of Milford. Thus, it is their intent that Robert would continue to remain in the same school, despite a possible move. The children have now resided primarily in this area with father since the Court's prior Order of April 4, 2001. Although mother should not be prejudiced by an Order that was remanded by the Supreme Court, the reality of the situation as it relates to the perception of the children is that a change of placement to mother would create an adjustment for Robert in his school and close friend, Bianca, and for Reese in her day care worker, Carolyn Black. Thus, the considerations of the adverse affects that any adjustment might have on the children in having the children live primarily with mother favor father somewhat. However, these children are young, and the Court believes that this is a minor consideration in this case.

*Mental and physical health:* The Court heard a considerable amount of testimony from Dr. Rosalind Kingsley and Dr. Theodore Wilson, both qualified psychologists. Dr. Kingsley's tests were performed in April of 2002. Dr. Wilson's tests were performed quite some time ago, covering the period from August 30, 2000, when he first saw father, to January 31, 2001, when Dr. Wilson administered the second (2nd) MMPI test to mother. Dr. Wilson's earlier testing was a child custody evaluation performed under the Order of the Court following father's motion. As such, it is quite possible that mother perceived Dr. Wilson to be father's hired expert. However, Dr. Wilson testified that he did not consider himself to be a hired gun, and that he only testified in custody cases where he believed he was testifying in the best interests of the child. As part of his custody evaluation, Dr. Wilson interviewed each of the parties, administered a five hundred sixty-seven (567) question MMPI to each of the parties, gathered histories from each of the parties, and also observed each of the parties, including stepmother, in the presence of the children.

Dr. Rosalind Kingsley was requested by the Court, as required by the Delaware Supreme Court, to provide a psychological evaluation of father, mother, and the children. The Court did not require Dr. Kingsley to perform a psychological evaluation of stepmother. It should be noted, however, that Dr. Kingsley expressed that she would have liked to have had the opportunity to examine stepmother, who was certainly an individual significantly involved in these childrens' lives.

Whereas Dr. Wilson uses as a tool primarily the Minnesota Multi–Phasic Inventory (MMPI), Dr. Kingsley prefers to use a battery of various tests, including figure drawing and sentence completion, and finally, the Rorschach test under the Exner system. Dr. Wilson acknowledged that Dr. Kingsley is much more adept at using the Rorschach, and Dr. Kingsley indicated that she seldom uses the MMPI. As Dr.

Wilson indicated, these two (2) tests, the MMPI and the Rorschach, are the most written-about tests in analyzing the personalities, and personality dysfunctions, of individuals. Dr. Wilson believes that the MMPI II is a more objective test than the Rorschach test. The MMPI involves having the client answer true or false to five hundred sixty-seven (567) computerized questions, and the answers are then factor-analyzed into various profiles established by answers given by a huge sample set of persons. The test compares the answers of the client to the normal range of answers, and the above-normal range of answers. If the answers land in the above-normal range, the answers require certain interpretation, which depends somewhat on the skill of the test administrator. The original MMPI was developed in the 1930s to assist in the diagnosis of psychiatric disorders. Dr. Wilson then went on to note that the Rorschach test is a more subjective assessment of the individual. He noted, however, that Dr. Kingsley would argue, and in fact Dr. Kingsley did argue, that the Rorschach test given under the Exner system is objective. Dr. Kingsley would argue that the Rorschach test under the Exner system has such a wide base of results, that it is now considered an objective test in the field. Basically, the Rorschach test is administered by showing the client various ink blots, and the client is then requested to state their impression of what they see in the ink blot. These results are then compared to the base of other answers as interpreted by the test administrator.

Dr. Wilson acknowledged that one (1) of the weaknesses in the use of the MMPI II, as often suggested by some of his colleagues in Wilmington, is that the MMPI test, by its own validity scales, often indicate that the other test results from the other scales of the test are invalid. In fact, mother's test results on the "L" scale (lie scale) on the second (2nd) MMPI test administered to mother, had a scale of eighty-six (86), which suggested that mother's results were not valid. Likewise, Dr. Wilson indicated that father's lie scale was sixty-five (65), which was marginally valid. Stepmother's lie scale was eighty-one (81), which indicated invalid results. Thus, for general purposes of evaluation, it appears that the results given on these tests were borderline helpful.

Interesting, however, despite the apparent lack of validity of all of the tests of mother, father, and stepmother, Dr. Wilson testified that mother's lie scale of eighty-six (86), especially appearing on a second (2nd) test of the MMPI II, indicated an extreme attempt by mother to look like she was free of problems and that she was extremely moral. Although father's lie scale was marginal, and stepmother's lie scale was eighty-one (81) on the first (1st) test administered to stepmother, Dr. Wilson opined that, although father and stepmother were both representing unrealistic claims of personal virtue, they did not rise to the level of mother's conscious distortion of the truth. Thus, although the overall results of Dr. Wilson's tests may not be helpful to the Court because of their various levels of invalidity, the Court does take note of Dr. Wilson's testimony concerning mother's conscious effort to distort the truth.

Dr. Wilson also had the opportunity to observe father, stepmother, and all four (4) children together. Although the observation was a short period of time quite some time ago, Dr. Wilson observed appropriate interaction between all of the children with their parents and each other, and also appropriate parental control, which in Kelly's case, he described as "impressive". In observing mother with her children, Dr. Wilson observed a considerable lack of control and consistency by mother. Dr.

Wilson was not aware when noting this initial observation that mother had worked all night, driven from Virginia Beach, Virginia to Delaware immediately after ending her shift in the morning, and spent several hours in the car on a cold, rainy day with the children before coming to the visit.

In his observations, Dr. Wilson also observed that the children climbed on their father, leading Dr. Wilson to conclude that father was a nurturer.

Dr. Wilson also had the benefit of hearing the testimony of Dr. Kingsley, who had examined psychologically the children and mother and father more recently. Dr. Kingsley had commented that mother was still grieving the death of Christine, who died in 1995. In Dr. Wilson's opinion, mother's grief for now seven (7) years, is beyond the normal time for bereavement. Dr. Wilson also expressed a concern that mother is taking Zoloft, but not having therapy. After having heard Dr. Kingsley's testimony concerning her psychological evaluation of the parties, Dr. Wilson noted that nothing in Dr. Kingsley's evaluation would cause Dr. Wilson to change his earlier opinion. That earlier opinion was that the children should not be split, they should not be involved in shared equal placement, and therefore, they would need to be in one (1) home or the other. Dr. Wilson felt that the children needed a stable, consistent environment, and that the father had the more stable of the two (2) environments.

Dr. Wilson felt that mother acted depressed. Dr. Kingsley's testing observed that mother showed signs of depression, but that she was coping. Dr. Kingsley's testing also revealed that mother had difficulty trusting others, and had a certain distrust of men. On the other hand, Dr. Kingsley's testing suggested that father had a good self-image and liked women.

According to Dr. Kingsley, father experienced stress, but was able to deal with his stress using sports as an outlet. Mother, on the other hand, suffered from chronic stress, and has not resolved the death of Christine, nor the loss of her marriage.

Neither husband nor wife presented with any physical difficulties. The Court has already commented on the physical limitations of the maternal grandparents who certainly demonstrate a certain amount of significance in the childrens' lives. As noted previously, although grandmother suffers from diabetes type II and the loss of a toe caused by circulation problems, the Court believes that grandmother will still be able to interact with her grandchildren.

The Court was also interested in hearing the comments by the psychologists regarding the childrens' physical and mental health. Dr. Kingsley noted the extreme attachment at this time by Reese to her father, which Dr. Kingsley described as the "Electra" phase. In fact, Dr. Kingsley stated that this is a very common phase for a young girl of ages two (2) to six (6) to experience. Separation of the young girl from her father at this time could cause problems for the child in the future. As described by Dr. Kingsley, the young female learns in this Electra phase to receive acceptance from her father. Later in life as the young female begins to develop sexually, she is able to gain acceptance from her father as to these developments, and, by doing so, avoids promiscuity.

There was also discussion by both psychologists of the Oedipal phase of a boy towards his mother. The Court was not clear as to when this phase occurs, and whether it in fact occurred with Robert, or whether Robert was perhaps separated during the development of this phase. However, the Court was told by both psychologists that Robert is a needy child, and

both agreed that Robert needs to spend more time with his mother. At the same time, Dr. Wilson expressed a concern that mother is clinging to Robert so closely, that she is not allowing Robert to experience his own necessary separation and individuation.

Robert suffers from encopresis, which is the soiling of one's pants. Both psychologists agreed that Robert's encopresis was suggestive of a concern that recommends therapeutic treatment for Robert. Originally, based upon Dr. Kingsley's testimony, the Court was led to believe, as no doubt Dr. Kingsley was led to believe by mother, that the encopresis began around the time the Court gave father primary placement in its Order of April 2001. However, as Dr. Wilson's notes demonstrated, mother had revealed to Dr. Wilson in her interview of November 1999, that Robert already was experiencing encopresis. None of the psychologists could state exactly what the cause of Robert's encopresis might be. Both of the psychologists agreed that Robert should be enrolled in therapy.

Upon hearing that mother has the two (2) children sleep in the same bed with her, Dr. Wilson expressed the concern that this was disruptive of Robert's need for separation and individuation. Dr. Wilson was also concerned that mother could be using her belief that Kelly was the cause of the break up of her marriage as a "rallying call" or family history by imparting this information to Robert and Reese. Both Dr. Wilson and Dr. Kingsley agreed that if a child asks a question, they need to be given a true answer. If they don't ask, they don't need to be told. Most importantly, however, once told, the children do not need to be continually reminded of a possible indiscretion of the other parent. But where one (1) parents makes as a rallying call the negative act of the other

parent, whether perceived or true, the parent who continually reminds the child is actually conducting their own type of revenge against the other parent through the child, and this can create an extremely negative consequence for the child.

Although there was no clear testimony that would suggest father has made negative statements about mother, Dr. Wilson had one (1) concern about one (1) of the responses father had given when asked what he believed was in the best interests of the children. Instead of father answering things about himself which were positive, father concentrated on negatives of mother. Thus, although no clear evidence was presented that father has denigrated mother in the presence of the children, except that father may have told the children that he and mother are no longer friends, the Court has concerns that father may also not be sending proper signals to the children about mother.

Generally speaking, the above considerations of the mental and physical health of the parties favor father. He appears to have a better self-image, and, although incurring stress, is much more capable of handling the stress than mother. Mother, on the other hand, suffers from depression, although she appears to be coping. Concerns were stated by Dr. Wilson that mother should be having therapy when she is taking Zoloft. To this response, mother indicated that at times she was attending therapy, although she was non-specific about the name of the therapist, or the time she attended. More importantly, however, is that mother suffers from chronic stress in which she has not been able to resolve the death of Christine, or the reality of the break up of her marriage. That break up appears to have been caused by numerous difficult circumstances which began with the death of Christine, followed by numerous other

events, which did not include the intervention of Kelly. However, mother has chosen to blame Kelly for the break up of her marriage, and appears to feel the need to vent her anger against father by contaminating the childrens' minds with indications that father and Kelly are bad people. Mother has also tainted the minds of her son, Jake, and the childrens' maternal grandmother, both of whom may also adversely affect these two (2) young children if they also choose to tell these young children of their ill-feelings for father and Kelly. Both psychologists agreed that the parties need to undergo family therapy amongst the parents, including stepmother, and that Robert also needs therapy to address his encopresis.

***Past and present compliance of both parents with their rights and responsibilities to their children under 13 Del. C. § 701:*** Pursuant to 13 *Del. C.* § 701, parents are equally charged with their childrens' support, care, nurture, welfare and education. In addition, as the Court noted at the beginning of this opinion, each parent has the responsibility to encourage their child to have significant and meaningful contact with the other.

Mother has failed in her parental responsibilities thus far in two (2) major aspects. First, she has failed to pay any child support for the children, despite the fact that she is gainfully employed. Although the Court realizes that mother had filed an appeal of the Commissioner's Order, this is no excuse for not having made some type of payment on her support obligation, which is now considerably in arrears. Second, mother has seriously denigrated the childrens' father and stepmother without just cause, and this can only be harmful to these children who want to love both their mother and father, and also their stepmother. This is completely contrary to the obligation of both

parents to assure that there is meaningful contact with the children and the parents.

***Evidence of domestic violence:*** Pursuant to Title 13, Section 722(a)(7), the Court is also required to consider evidence of domestic violence as provided for in Chapter 7A of Title 13 Delaware Code. Title 13, Section 703A (a) is as follows:

(a) "Domestic violence" includes but is not limited to physical or sexual abuse or threats of physical or sexual abuse and any other offense against the person committed by 1 parent against the other parent, against any child living in either parent's home, or against any other adult living in the child's home. "Domestic violence" does not include reasonable acts of self-defense by 1 parent for self-protection or in order to protect the child from abuse or threats of abuse by the other parent or other adults living in the child's home.

Pursuant to Title 13, Section 706A, the Court is required to consider any evidence of a past or present act of domestic violence in custody and residential living arrangements for a child, and is further required to make specific written findings in support of any decision which would award custody or primary residence to a party who has committed acts of domestic violence as previously defined.

Pursuant to Title 13, Section 703A (b), convictions of certain delineated offenses when committed against the child at issue, the other parent of the child, or any other adult or minor child living in the home, defines the offending parent as a "perpetrator of domestic violence". These offenses are detailed as follow:

(b) "Perpetrator of domestic violence" means any individual who has been convicted of committing any of the following criminal offenses in the

State, or any comparable offense in another jurisdiction, against the child at issue in a custody or visitation proceeding, against the other parent of the child, or against any other adult or minor child living in the home:

(1) Any felony level offense;

(2) Assault in the third degree;

(3) Reckless endangering in the second degree;

(4) Reckless burning or exploding;

(5) Unlawful imprisonment in the second degree;

(6) Unlawful sexual contact in the third degree; or

(7) Criminal contempt of Family Court protective order based on an assault or other physical abuse, threat of assault or other physical abuse or any other actions placing the petitioner in immediate risk or fear of bodily harm. (69 Del. Laws, c. 309, § 4; 70 Del. Laws, c. 186, § 1.)

In the last category, Criminal Contempt of a Family Court PFA, it should be noted that one is characterized as a perpetrator of domestic violence only where one is held in criminal contempt of a Family Court Protective Order, and that the criminal contempt is based upon an assault or other physical abuse, or threat thereof, all of which places the other party in immediate risk or fear of bodily harm.

In cases where a party is defined as a "perpetrator of domestic violence", there is a presumption under Title 13, Section 705A (a) and (b) that the perpetrator of domestic violence shall not be awarded sole or joint custody of any child, nor shall the child primarily reside with the perpetrator of domestic violence. However, Ti-. tle 13, Section 705(c) allows these presumptions to be removed if there has been no further acts of domestic violence, and the perpetrator has successfully completed a program of evaluation and counseling specifically designed for perpetrators of domestic violence, has completed a program of alcohol and/or drug abuse counseling if the Court determines that such counseling is appropriate, and has demonstrated that it would be in the best interests of the child to give the perpetrator custody or residential responsibilities.

It is important to note the distinction between a party being defined as a "perpetrator of domestic violence" and a party who has committed domestic violence. Certainly, the person who is defined as a "perpetrator of domestic violence", because he or she falls within one of these very serious and specifically defined categories, is treated much more intensely by the statute, and the designation automatically raises the rebuttable presumptions against awarding the perpetrator custody of any nature, as well as placement. However, there can also be acts of domestic violence that, although they do not fall in the very serious categories which define a "perpetrator of domestic violence", are a relevant factor that must be considered by the Court in custody matters.[12]

Section 708A of Title 13 goes on to require *"In all cases in which the Court finds by a preponderance of the evidence that one (1) of the child's parents has committed an act of domestic violence against the child, against the other parent or against any other person living in the child's household, the Court shall determine a schedule, location and conditions for visitation that best protects the child and the victim of domestic violence from further violence."*

---

**12.** Tit. 13, Section 706A (a).

The only allegations of domestic violence that were raised for this Court's consideration were the allegations set forth in the Protection From Abuse Petition filed by mother on October 15, 1999. As had been previously pointed out in this opinion, most of mother's allegations in her PFA complaint were based upon her then belief that father was having an affair with the babysitter, Kelly. None of these complaints would rise to the level of a finding of abuse. The only allegation that mother made that the Court would consider as being any type of domestic abuse, was mother's allegation that father had grabbed and twisted mother's wrist during an argument. Father denied this allegation. Mother had no other testimony to confirm this allegation, such as testimony by others of observed bruises or photographs of bruises.

When mother's PFA petition came before the Court for a hearing on November 12, 1999, the parties entered into a Consent Agreement. The Court understands that there are many reasons why the parties enter into Consent Agreements. In some of those cases, they do so because they find the Agreement to be acceptable, and they want to avoid going to a trial where an unwanted result might fall upon one person's word being weighted against another, with nothing else. Such was the case in this instance. At the time, father was not represented by counsel. The mediator had explained to him that if the parties went to trial, it would be his word versus the word of mother. The mediator also told father that a Consent Order would be inadmissible in a custody case. Finally, the Consent Order was extremely fair to both parties, in that it basically split the time for the children between the parents on a shared basis, and also involved

an agreement whereby the parties shared the transportation.

Given all of the above, mother has certainly failed in her burden of proof to convince this Court that father was ever guilty of an act of domestic violence.

## MORAL CHARACTER DEVELOPMENT

When the Delaware Supreme Court reversed this Judge's earlier decision of April 4, 2001, and remanded the case for a new custody hearing, the Supreme Court noted, based upon the facts presented at the first (1st) hearing, "*A reasonable inference is that father was engaged in an openly adulterous relationship to which his children were exposed.*"[13] The footnote to the Supreme Court's decision stated that "*The testimony also suggested that when the children were visiting with father, both before and after his marriage, they slept together on a bed set up for them in father and [father's eventual wife's] bedroom.*" The Supreme Court went on to state "*If true, such conduct, as it affects the 'moral character development' of the children, is a relevant consideration in determining the best interests of the children, notwithstanding the adulterous parent's subsequent remarriage.*" The Supreme Court then went on to cite the case of *Elizabeth A.S. v. Anthony M.S.*, a 1981 Delaware Supreme Court decision holding that, in custody and visitation cases, the Family Court should consider the effect of a parent's open and continuous adulterous conduct as it affects the child's moral and emotional development.[14]

Upon a closer review of the 1981 Supreme Court decision in *Elizabeth A.S. v.*

---

**13.** *Martin v. Martin,* 797 A.2d 678 (Table), 2002 WL 229502 (Del.Supr.2002).

**14.** *Elizabeth A.S. v. Anthony M.S.* 435 A.2d 721, 724–725 (Del.1981).

*Anthony M.S.*,[15] this Court notes that the Supreme Court's decision focused on a change of legislative ideology between pre–1974, and the post–1974 changes in the law of this State. As per the Supreme Court's decision, *"Prior to 1974, it was the case law of this State that an immoral atmosphere was presumptively against a child's 'best interests'; and a parent involved in a continuing adulterous relationship was presumed to have forfeited his or her rights to custody and visitation."* The Court's decision went on to state, citing the case of *In Re Two Minor Children* [16], *"One circumstance repeatedly held to establish a forfeiture of the right to custody of children is the continuance of an adulterous relationship by a guilty parent which has caused the marriage to disrupt in divorce. The reason is that an immoral atmosphere is presumptively injurious to the child's welfare."* (Emphasis added). Thus, even in the pre–1974 environment, there was some emphasis that the adulterous relationship was the cause of the marriage breakup.

One must keep in mind that the definition of adultery in the State of Delaware has been a single person having sexual intercourse with a married person.[17] To the Court's knowledge, this definition has not been changed. The 1953 Delaware Code Annotated continued to contain this same definition at Title 11, Section 311.

The Delaware Annotated Code of 1953 made adultery one (1) of the grounds of divorce, when it stated that the causes for divorce from the bonds of matrimony shall

be—1) adultery.[18] However, two (2) notable changes have occurred in Delaware laws as they relate to the definition of adultery. First, in the 1973 revision of the Delaware criminal code, the General Assembly abolished adultery as a crime. Second, and more importantly, the 1981 Delaware Code changed the grounds of divorce from the various previously-noted grounds of fault, which included adultery, to other identified grounds which included *"Separation caused by respondent's misconduct."* [19] Misconduct included, as an example, adultery.[20] The important distinction in the 1981 change was that no longer was the adultery alone the grounds of the divorce; instead, after 1981, it was the separation caused by the adultery. Thus, although parties who are separated, but still married, may by their sexual relationships created subsequent to their separation fall within the strict historical definition of adultery, the legislature shifted the emphasis to the adultery that caused the separation, where the sexual acts obviously had occurred prior to the separation. Present law still allows as a grounds for divorce the 1981 wording of *"separation caused by respondent's misconduct"* [21], and still includes adultery as an example of misconduct.[22] Thus, it is clear that the Delaware legislature, at least since the change of laws in 1981, has focused its emphasis on the adulterous conduct which occurred prior to and caused the separation. Conduct which began following the separation, but prior to the divorce, although narrowly falling within the defini-

---

**15.** 435 A.2d 721 (Del.1981).

**16.** *In Re Two Minor Children,* 173 A.2d 876, 878–879 (Del.1961).

**17.** *State v. Alamanio,* 104 A. 66 (Del.Gen.Sess. 1918); Del. Revised Code 1915, § 4788 A (29 Laws Del. c. 264).

**18.** Tit. 13, § 1522(1).

**19.** Del.Code Ann. tit. 13 § 1505(b)(2) (1981).

**20.** Del.Code Ann. tit. 13, § 1503(5) (1981).

**21.** Tit. 13, § 1505(b)(2).

**22.** Tit. 13, § 1503(5).

tion of adultery, does not form a basis for divorce.

The 1981 Delaware Supreme Court decision in *Elizabeth A.S. v. Anthony M.S.*, in addition to describing the pre–1974 environment, established that after the 1974 legislative changes, the Delaware Courts still were concerned with protecting the moral development of a child.[23] The 1981 Court went on to explain that, while a parent involved in an adulterous relationship in a pre–1974 environment would forfeit a right to visitation, the post–1974 environment created a presumption in favor of visitation for even an adulterous parent. Furthermore, the Court went on to state, *"The burden [of proof] is no longer upon the adulterous parent seeking visitation to demonstrate that 'there has taken place in fact a change in character on the part of the adulterous parent' and that visitation 'will not adversely affect the child.' Rather, the burden now rests upon the custodial parent to prove that unrestrictive visitation 'would endanger the child's physical health or significantly impair his emotional development'."*[24] The Supreme Court went on to recognize the inherent problems in predicting the impact upon the child, who in that case, was approximately one (1) year old. The error in the lower Court's *Elizabeth A.S.* decision was that the lower Court failed to allow mother to attempt to meet her burden of proof that there would be such an impact upon the child as to endanger the child's physical health or significantly impair the child's emotional development.[25]

The Supreme Court's 1981 decision in *Elizabeth A.S. v. Anthony M.S.* concerned itself with visitation. Now, as then, the present Delaware statute requires that the Court award frequent and meaningful visitation unless such would endanger a child's physical health or significantly impair his or her emotional development.[26] The strict burden of proof in visitation cases is lessened somewhat where there is clear and convincing evidence that a child is being exposed to an environment tainted by numerous acts of domestic violence where, although not yet manifesting endangerment to the child's physical health or significant impairment of the child's emotional development, the Legislature, by passage of the Child Protection From Domestic Violence Act[27] at Title 13, Section 701A, et. seq. has deemed that such an environment of persistent domestic violence presents a predictive harm to the child that requires restrictions on visitation.[28]

The present case does not primarily involve the issue of visitation; instead, the present case involves the issue of with whom the child should be primarily placed. As such, as compared to the test on a visitation issue, the test in a custody case for a parent claiming that the other parent has demonstrated immoral conduct is not whether the placement with the one parent would endanger the child's physical health or significantly impair the child's emotional development, or whether there exists a statutorily created area that raises a presumption of predictive harm. Instead, the effect a parent's immoral conduct will have

23. *Elizabeth A.S. v. Anthony M.S.* 435 A.2d 721, 725 (Del.1981).

24. *Elizabeth A.S. v. Anthony M.S.* 435 A.2d 721, 726 (Del.1981).

25. *Elizabeth A.S. v. Anthony M.S.* 435 A.2d 721, 726 (Del.1981).

26. Tit. 13, § 728(a).

27. Tit. 13, § 701A et. seq.

28. *C.L. v. R.T.*, Del.Fam., File No. CS95–045926, Henriksen, J., 2002 WL 31998975 (July 23, 2002).

on whether or not a child is placed with that parent lies more as one of several considerations which a Court must review in the totality of considerations leading to the Court's determination of the best interests of a child. This consideration could perhaps be related to how a child interacts with a parent and the other significant individual with whom the parent has become involved; it could be weighed in considering a child's adjustment to a new home in which a parent and the new significant other person are living; it could be related to considerations by the Court as to the impact the knowledge of such a relationship would have on the child's mental or physical health; and, it might even be considered in relation to the general rights and responsibilities of parents as defined under Title 13, Section 701. Furthermore, even if not fitting into one of those aforesaid areas specifically set forth in Title 13, Section 722, the Court is also allowed to consider all relevant factors, and morality can certainly be considered an additional relevant factor.

■ The party who alleges that the other party is living immorally, must prove by a preponderance of the evidence that the immoral conduct exists, and, more importantly, that such immoral conduct has an adverse affect upon the child. Although that level of proof need not rise to the level of proof required to terminate or limit visitation, that being that the existence of the immoral relationship endangers the child's physical health or significantly impairs the child's emotional development,[29] there must be proof that the immoral relationship causes some adverse effect on the child. Even if one parent's immoral conduct is proven to have an adverse effect on a child, the Court must still weigh that impact with and against all of the other best interest considerations set forth in Title 13, Section 722.

■ In the case of alleged adultery, not only must the complaining party prove that the other committed adultery, meaning that the other party had sexual intercourse with a nonspouse while married, the complaining spouse must also prove that the adultery occurred prior to, and caused, the separation of the parties. Sexual intercourse with another individual after one has separated, although not yet divorced, should not, for purposes of a morality issue in a custody case, be considered immoral. Our Legislature has made the separation of the parties the key event for the grounds for divorce and recognizes that the separation date is the date the marriage is irretrievably broken.[30] After separating, people move on in their lives and often form new relationships. Although the date of the divorce is the ceremonial end of the marriage, and the date used for certain legal determinations, the date of separation is the realistic end of the relationship. This is not to say, however, that the interaction between a child and a parent's new significant other following separation and divorce is not important for the Court's consideration. Indeed, although the relationship might not be considered immoral as statutorily determined in this opinion, the Court must still consider how the new relationship between parent and significant other impacts upon the child.

Given the foregoing statutory and case law analysis, let us apply the above principles to the case at hand.

---

**29.** Although the Legislature has given special attention to the area of domestic violence as set forth in Title 13, Section 701A et. seq., there is no special legislation that would lead to a predictive harm presumption involving a child's exposure to immoral relationships.

**30.** Tit. 13, § 1505(b).

First of all, mother has failed to prove that father committed adultery which caused the parties' separation. Indeed, the only thing that was clear to the Court, is that father's present wife had contact mainly with father, but also with mother, prior to the parties' separation as a friend and paid babysitter. Upon physically separating from mother, father did not take up residence immediately with his friend and babysitter and eventual wife. Instead, he slept at the station house and lived out of his car for a time, and thereafter lived in a hotel room for two (2) weeks with his children. Also, if father and his present wife had established a romantic relationship earlier than Thanksgiving of 1999, it would have made no sense for father's present wife to thereafter have entered into a contract to build a house that was only big enough to accommodate father's present wife and her two (2) children. This home was not to be completed until January of 2000. A myriad of factors, none of which was father's friendship with his present wife, led to the deterioration of the marriage and eventual separation of mother and father. It was only after the parties had separated both emotionally and physically that father and his present wife entered into their significant relationship which led to them living together, having sexual relations together, and eventually becoming married. As stated in the divorce case of *Charles H. Adkins v. Ola B. Adkins*, 190 A. 740 (Del.Super.Ct.1937), adultery, where proved by circumstantial evidence, requires two (2) elements: (1) The opportunity to commit the offense, and (2) Adulterous dispositions or inclinations of the defendant and the alleged *particeps criminis*. The opinion goes on to note, "... *where guilt is to be inferred from circumstances, the sufficiency of proof is to be found in a preponderance of inferential evidence which, weighing the presumption of innocence in favor of the defendant, would lead the guarded discretion of a reasonable and just mind to the conclusion of guilt; and such conclusion should not be the result of a rash judgment, founded on appearances that are equally capable of two interpretations."* In the 1937 *Adkins* case, the Superior Court found that, although there was considerable opportunity for the parties to have sexual intercourse, there was not the slightest showing of the inclination to have sexual intercourse, "... *usually evidenced by kissing, embracing, lewd behavior or speech, or by compromising situations or letters."* In the present case, mother presented no evidence to prove the possible inclination for adultery, such as observing kissing, hand holding, and the like. Furthermore, mother provided no evidence that there was ever the opportunity for father and his future wife to have had sexual relations. The testimony indicated simply that the interaction between father and his future wife always occurred at times when father and his future wife were exchanging the children, or were taking walks in the park with each of their respective children.

Thus, mother failed to prove any immoral adulterous conduct by father that occurred before, and caused, the separation. In addition, mother failed to offer any proof that the children had any knowledge of this conduct, even if it had existed, except perhaps pursuant to the misguided statements of mother, who said, in the presence of the children, that stepmother stole the childrens' father from them. In the first place, as this Court has already stated in this opinion, mother fails to recognize that father's eventual relationship with his present wife came well after the several unfortunate events, some catastrophic, which led to the demise of the marriage between mother and father. In

addition, according to the testimony of both psychologists, even if father's conduct had been immoral, these young children, were not presently adversely affected by father's relationship with his new wife. Even more, the psychologists agreed that a future understanding of an immoral relationship which might be acquired by the children as they get older, would also be unlikely to harm these children unless a question asked and once answered became a repeated theme, by mother in this case, to make father look bad. In such a case, mother's actions, if they did occur, could cause problems for the children, but the cause of those problems would be the result of mother's extremely inappropriate behavior which would be absolutely contrary to the best interests of her children.

## CONCLUSION

■ Based upon all of the foregoing, it is the Court's decision to award joint custody to both of the parents, with primary placement awarded to father. In reaching that decision, the Court considered all of the factors set forth in Title 13, Section 722, and included special consideration of the morality issue raised by mother. Mother failed to prove that father was guilty of any immoral conduct. Furthermore, and more importantly, mother failed to prove that, had father been guilty of any immoral conduct, such conduct would have an adverse impact upon the children. According to both psychologists, an adverse impact on these children would result only if mother chose to continue to seek revenge against father for ending the marriage by denigrating father and stepmother in the presence of the children. It was clear to the Court that the marriage between mother and father was over long before father's present wife became involved in the lives of these parties. This Court continues to have concerns that mother will continue to denigrate father and stepmother in the presence of the children, despite mother's assertion that she will no longer do so. Mother has obviously tainted both the childrens' paternal grandmother, and the childrens' half-brother, Jake, into believing that father abandoned mother for another woman. When in fact, the truth is that the marriage between mother and father had ended well before father's present wife's involvement with the family through a series of very significant stressors in the marriage which began with the death of mother and father's daughter, Christine.

The Court finds that father's household offers greater stability to these two (2) children, both physically and mentally. In father's home, the children have the benefit of having two (2) other step-siblings with whom they have interacted well for quite some time. The children also have the benefit of having father and stepmother share the responsibility of parenting them, and the Court finds that father and stepmother approach their responsibilities as parents in a stable, consistent, and loving manner. The one (1) downside of father's household, is that the living quarters continue to be cramped, and it is the Court's hope that father and stepmother will continue to seek alternate housing, as they have indicated. On the other hand, the Court is concerned that mother continues to have difficulty coping with and resolving the stressors in her life, which include the loss of her daughter Christine, who died almost seven (7) years ago, and the break up of her marriage.

At the same time, the Court recognizes the childrens' needs, especially Robert's, to spend more time with their mother. This additional time can be resolved through visitation, since under the prior Order of this Court, mother was only seeing Robert one (1) weekend per month, together with

certain holidays. The Court's Order will reflect its recognition of the need for Robert to have special counseling. The Court's Order will also reflect the need for mother to make a priority of changing her ways, so that she will be on time for scheduled visitation exchanges, so as not to disappoint the children.

Accordingly,

**IT IS HEREBY ORDERED**:

1. Joint custody of Robert B. Martin, a male minor child born March 29, 1996, and Reese M. Martin, a female minor child born May 23, 1997, is hereby awarded to their parents, Walter B. Martin, father, and Lisa M. Martin, mother, with primary placement awarded to father.

2. Mother's visitation is as set forth in the attached guidelines, which follow the standard visitation guidelines of the Court, but with the following notable exceptions:

   a. Mother's alternate weekend visitation shall commence Friday, September 6, 2002, with all alternate weekends beginning on Friday at 6:00 p.m. until Sunday at 6:00 p.m. If mother's weekend is immediately followed by a Monday on which the children do not have school, mother's weekend visitation shall be extended to 6:00 p.m. on Monday.

   b. Weekday Wednesday evening visitations are eliminated.

   c. Father shall have the holidays in Column 1 in odd-numbered years and holidays in Column 2 in even-numbered years. Mother shall have the holidays in Column 1 in even-numbered years and holidays in Column 2 in odd-numbered years. For purposes of clarification of the respective holidays, Thanksgiving shall be the time period from 9:00 a.m. Thanksgiving morning until 11:00 a.m. on Sunday of Thanksgiving weekend, noting that any other alternate weekend scheduled visitation which might occur on this weekend shall not occur in deference to the Thanksgiving schedule. Furthermore, Easter shall be defined as the period from 6:00 p.m. on Maundy Thursday until 6:00 p.m. on Easter Sunday, again, noting that this takes precedence over any alternate weekend visitation.

   d. The paragraph on Mother's Day/Father's Day shall be deleted, as will the paragraph on birthdays.

   e. In odd-numbered years, father shall have the children for the Christmas school break from the day school gets out until 6:00 p.m. on the 27th of December, at which time mother shall have the children from 6:00 p.m. on the 27th of December until 6:00 p.m. on **December 31st**. In even-numbered years, mother shall have the children from 6:00 p.m. on the evening following the day the children get out of school until 6:00 p.m. on the 27th of December, and father shall have the children from 6:00 p.m. on the 27th of December for the balance of the school vacation.

   f. Beginning with the summer of 2003, summer vacations shall be modified to provide mother with six (6) weeks summer vacation. The first two (2) weeks shall be for fifteen (15) consecutive days with the pick up and exchange occurring at 6:00 p.m. on the third (3rd) Sunday of June and the return exchange occurring at 6:00 p.m. on

the Sunday occurring fifteen (15) days later. The second two (2) weeks will occur for fifteen (15) days with the pick up and exchange occurring at 6:00 p.m. on the second Sunday of July, with the return exchange occurring on the Sunday occurring fifteen (15) days later at 6:00 p.m. The final two (2) weeks shall occur for fifteen (15) days beginning at 6:00 p.m. on the first Sunday in August, with the return being on the Sunday occurring fifteen (15) days later at 6:00 p.m. Because of this extended summer visitation, mother shall have no weekend visitation during the months of June, July or August.

g. The transportation paragraph of the standard visitation guidelines shall be changed to reflect that all exchanges of the children will occur at the Pocomoke, Maryland Police Station. Mother is required to telephone father when she is leaving her home to come for the exchange, in order that father will know that mother intends to appear. If mother is thirty (30) minutes late in arriving for the exchange time when picking up the children, she shall forfeit that particular period of visitation.

h. Mother shall have the children every year for school spring vacation from 6:00 p.m. Easter Sunday until 12:00 noon the following Saturday, assuming that is when spring school vacation occurs. If the spring school vacation occurs at a different time than immediately following Easter weekend, mother shall then have the children for the eight (8) day period from the Saturday preceding the vacation week at 12:00 noon until the last Saturday of the vacation week at 12:00 noon.

i. Mother shall also be allowed such additional visitation as the parties can mutually agree upon.

3. Father shall be required to arrange for counseling for both children which shall continue so long as the counselor deems it appropriate, and which shall include, if the counselor deems it appropriate, participation by mother and stepmother. All costs of counseling will be handled as a medical expense and be paid according to the Support Order of this Court.

4. The Court will enter a separate Order concerning payment of Dr. Kingsley's fees, and shall also in that Order address any separate applications made by the parties for payment of their respective costs and attorneys fees.

**IT IS SO ORDERED** this 19th day of August, 2002.

## ATTACHMENT

### FAMILY COURT OF THE STATE OF DELAWARE STANDARD VISITATION GUIDELINES

#### *Martin v. Martin*

#### *In Re: Robert B. Martin (DOB: 03.29.96) and Reese M. Martin (DOB: 05.23.97)*

Parents are encourage to create an agreed equitable written visitation schedule that fits their circumstances and their children's lives, with the following serving as a schedule when the parents cannot agree. Nothing herein prohibits the parents from changing the schedule upon mutual agreement. In the event of conflicting dates and times, the following is the

order of priority: Holidays; birthdays; summer vacation and school breaks; weekends; then weekdays. This schedule presumes that if the parents have more than one child, the visitation will be exercised with all children together.

If a child indicates a strong opposition to being with the other parent, it shall be the responsibility of both parents to appropriately deal with the situation by calmly discussing with the child his or her reasons, and to work together to alleviate these misgivings without confrontation or argument. If they cannot resolve the problem, the parents shall seek the immediate assistance of a counselor or other professional, or may file a motion requesting Court-ordered counseling. It is the absolute affirmative duty of the residential parent to foster an environment which avoids such problems and to make certain that the children go for visitation.

**Weekends:** The non-residential parent shall have visitation on alternate weekends from Friday at 6:00 p.m. to Sunday at 6:00 p.m. beginning Friday, September 6, 2002. If the non-residential parent's weekend is immediately followed by a Monday on which the children do not have school, the mother's weekend visitation shall be extended to 6:00 p.m. Monday.

**Holidays:** Father shall have the children on the holidays in Column 1 in odd-numbered years and the holidays in Column 2 in the even-numbered years. Mother shall have the children on the holidays in Column 1 in even-numbered years and the holidays in Column 2 in odd-numbered years:

| Column 1 | Column 2 |
| --- | --- |
| Easter weekend | Thanksgiving weekend |

**School Breaks (Winter and Spring:** See Paragraph 2(e) and (h) of this Order.

**Summer vacation:** Summer vacation is as appears in Paragraph 2(f) of this Order.

Each parent shall provide the other parent with destination, times of departure and arrival, and method of travel when taking the children outside the parent's community.

**Late pick-up:** The residential parent shall have the children ready for pick-up at the start of all visitation periods. The children and the residential parent have no duty to wait for the non-residential parent to arrive for visitation more than thirty (30) minutes, unless notified. The non-residential parent who arrives more than thirty (30) minutes late without prior notification for a particular visitation forfeits that visitation, unless the residential parent agrees otherwise.

**Drop-off:** The non-residential parent will not return the children early from visitation unless the parents agree to a different drop-off time in advance. The residential parent or other adult well-known to the children must be present when the children are returned from visitation.

**Canceling visitation:** Except in emergency situations, the non-residential parent must give at least twenty-four (24) hours advance notice when canceling a visitation period.

**Medical treatment and emergencies:** If the children become seriously ill or injured, each parent shall notify the other parent as soon as practicable. If the children become ill or injured during visitation, the non-residential parent shall contact the residential parent to secure treatment unless the situation is a medical emergency.

**Telephone/mail:** Neither parent shall interfere with telephone or mail contact between the children and the other parent. Long distance calls from an out-of-town parent shall be at that parent's expense.

*Transportation:* All exchanges of the children shall occur at the Pocomoke, Maryland Police Station. Any person transporting the children may not be under the influence of alcohol or drugs, and must be a licensed, insured driver. All child restraint and seat belt laws must be observed by the driver. Car seats should be exchanged when required.

*School work:* Parents shall provide time for children to study and complete homework assignments, even if the completion of work interferes with the parent's plans for the children. The residential parent is responsible for providing the non-residential parent all of the school assignments and books. Summer school which is necessary for a child must be attended, regardless of which parent has the child during the summer school period.

*Extracurricular activities:* Regardless of where the children are living, their continued participation in extracurricular activities, school related or otherwise, should not be interrupted. The parent with whom the children are visiting shall be responsible for providing transportation to activities scheduled during visitation with that parent. Each parent shall provide the other parent with notice of all extracurricular activities, complete with schedules and the name, address and telephone number of the activity leader, if available.

*Out-of-state relocation:* Upon relocation of the children from the State of Delaware, the parents should attempt to agree to a modified visitation schedule. If the parents cannot agree, the parent who is moving shall file a petition asking the Court to modify the visitation schedule. The Court may consider the allocation of transportation expenses.

*Notice of change of address:* Both parents shall give written notice to the other parent immediately upon any change of address and/or phone number, unless a restrictive Order has been obtained from the Court. A copy of the notice shall also be provided to the Family Court, *22 The Circle, Georgetown, Delaware 19947.*

* Pseudonyms have been assigned to the parties to protect their identities.